[Cite as *State v. Tabasso*, 2012-Ohio-5747.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
No.   98248

## STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

## JUSTIN A. TABASSO

DEFENDANT-APPELLANT

### JUDGMENT:
AFFIRMED

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-554082

**BEFORE:** Boyle, P.J., Jones, J., and Keough, J.

**RELEASED AND JOURNALIZED:**   December 6, 2012

**ATTORNEY FOR APPELLANT**

Ruth Fischbein-Cohen
3552 Severn Road
Suite 613
Cleveland Heights, Ohio   44118

**ATTORNEYS FOR APPELLEE**

Timothy J. McGinty
Cuyahoga County Prosecutor
BY:   Sheila Turner-McCall
Assistant County Prosecutor
8th Floor Justice Center
1200 Ontario Street
Cleveland, Ohio   44113

MARY J. BOYLE, P.J.:

{¶1}   Defendant-appellant, Justin Tabasso, appeals his felonious assault conviction. He raises two assignments of error for our review:

[1.] The conviction was against the manifest weight of the evidence.

[2.] Trial counsel was ineffective in that he did not request an instruction on self-defense, as it was appropriate in this case.

**{¶2}** Finding no merit to his appeal, we affirm.

Procedural History and Factual Background

**{¶3}** In September 2011, Tabasso was indicted on one count of felonious assault, a second degree felony, in violation of R.C. 2903.11(A)(1). The indictment arose out of allegations that Tabasso physically assaulted Nicholas Martaus on July 18, 2011. The following facts were presented to the jury.

**{¶4}** Martaus testified that he and Amanda Shea dated off and on from March 2009 to June 2011. At some point in 2011, Shea began dating Tabasso as well. Martaus said that he and Shea finally ended their relationship in June 2011, but said that he and Shea remained friends.

**{¶5}** Shea called Martaus at 4:30 a.m. on July 18, 2011, and told him that she was outside of his apartment. Martaus went outside to talk to Shea. The two sat on Martaus's front steps and talked. Martaus heard Shea say something to someone who was behind him, but before he could even turn around to see who it was, the person began hitting Martaus. Martaus realized that it was Tabasso who was hitting him. Martaus said Tabasso held him by his hair and hit him repeatedly in his face. At some point, Tabasso stopped punching Martaus and began to kick him and "stomp on him." Martaus heard Shea scream, "[g]et off of him, Justin." Martaus stated that Tabasso kept asking him, "why don't you respect me."

**{¶6}** Martaus rolled away from Tabasso and grabbed his cell phone to call 911. At that point, Shea fled and Tabasso followed her. In Martaus's call to 911, Martaus told the operator that he had just been jumped outside of his house by "Justin Tabasso." Martaus was transported to the hospital by paramedics.

**{¶7}** Martaus testified that as a result of the beating, his ribs, skull, and jaw were fractured, and his "sinus ruptured." He identified several photos of himself that had been taken after the fight. The photos show bruises, cuts, and red marks all over Martaus's face, torso, and back. The photos further show where Martaus's hair had been pulled out and where one of his front teeth had been knocked out.

**{¶8}** Shea testified that at the time of trial Tabasso was her boyfriend. Shea did not consider herself and Martaus to be friends in July 2011 when the fight occurred. She stated that she went over to Martaus's house at 4:30 a.m. after she got off work because he had been bugging her to talk to him and that was the only time that she could find to do it. Shea explained that she planned to tell him to stop texting and calling her.

**{¶9}** Shea testified that when she saw Tabasso walking up to Martaus's front steps, she got nervous and asked Tabasso what he was doing there. Shea "got up and grabbed [her] stuff and * * * ran to [her] car." She could hear Martaus and Tabasso yelling. After she got in her car, she could see Martaus and Tabasso fighting. She said that she saw Martaus punch Tabasso, but she did not see Tabasso hit Martaus. As she was leaving, she saw them

wrestling on the ground. Shea said that she went to Tabasso's house to get her belongings. After she left Tabasso's, she went to the hospital to see Martaus.

{¶10} Shea testified that she did not want to give a statement to police because she did not want to be in the middle of Tabasso and Martaus. Shea said that Tabasso did not have a problem with her and Martaus being friends.

{¶11} Officer Thomas Smith testified that he responded to the scene. He could tell from Martaus's appearance that he had just been in a fight. He learned from Martaus that he had just been beaten up by his ex-girlfriend's new boyfriend. Martaus gave him Shea's and Tabasso's names.

{¶12} Detective Jeanie Joyce testified that she interviewed Martaus the day after the fight. Martaus told Detective Joyce the same story that he gave in court. Detective Joyce took the photos of Martaus's injuries when she interviewed him, which was one day after the fight.

{¶13} Detective Joyce testified that she interviewed Shea as well. Detective Joyce explained that it was very clear to her that Shea did not want to cooperate with her. In the statement that Shea gave to Detective Joyce, Shea stated that Tabasso hated the fact that "Nick and I still talk and hang out," but said that she told Tabasso, "we are friends and there is nothing he can do about it." Shea told Detective Joyce that when Tabasso appeared at Martaus's house, she saw that Tabasso and Martaus "were in each other's faces," and she took

off running down the street. In her statement, Shea denied that she ever saw Tabasso hit Martaus. She told Detective Joyce that after she left, she went to "[Tabasso's] house to get her things," and that "she never wanted to see him again." Shea stated that after she left Tabasso's house, she went to the hospital "because [she] wanted to make sure that [Martaus] was o.k." Detective Joyce believed that Shea was holding back information from her.

{¶14} The jury found Tabasso guilty of felonious assault as charged. The trial court sentenced him to two years in prison, and then stated, "I'm going to suspend the sentence and place him on five years probation, but he's going to do 90 days in the Cuyahoga County jail starting right now." The trial court further ordered that Tabasso pay $13,427 for medical bills and $4,800 for lost wages in restitution to Martaus.

<u>Manifest Weight of the Evidence</u>

{¶15} In his first assignment of error, Tabasso argues that his conviction was against the manifest weight of the evidence.

{¶16} In reviewing a claim challenging the manifest weight of the evidence,

> [t]he question to be answered is whether there is *substantial* evidence upon which a jury could reasonably conclude that all the elements have been proved beyond a reasonable doubt. In conducting this review, we must examine the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether the jury clearly lost its way and created such a manifest miscarriage of

justice that the conviction must be reversed and a new trial ordered.

(Internal quotes and citations omitted.) *State v. Leonard*, 104 Ohio St.3d 54, 2004-Ohio-6235, 818 N.E.2d 229, ¶ 81.

**{¶17}** Tabasso maintains that his conviction was against the manifest weight of the evidence because Shea's testimony contradicted Martaus's testimony. Due to "circumstances of conflicting stories and a lack of credibility," Tabasso contends that his convictions should be overturned.

**{¶18}** Under well-settled precedent, we are constrained to adhere to the principle that the credibility of witnesses and the weight to be given to their testimony are matters for the trier of fact to resolve. *See State v. DeHass*, 10 Ohio St.2d 230, 231, 227 N.E.2d 212 (1967). Here, the jury heard all of the testimony and was free to believe Martaus over Shea. Further, other evidence supported Martaus's version of the events, including Martaus's 911 call, Officer Smith's testimony, and Detective Joyce's testimony. Based on the record before us, we cannot say that the trier of fact clearly lost its way. Accordingly, we find that the conviction is not against the manifest weight of the evidence and, therefore, overrule Tabasso's first assignment of error.

Ineffective Assistance of Counsel

{¶19} In his second assignment of error, Tabasso maintains that his trial counsel was ineffective for failing to request a jury instruction on self-defense because after the "only eye-witness testified, it became crystal clear that Justin Tabasso had no choice but to use self-defense."

{¶20} To establish ineffective assistance of counsel, a defendant must show (1) deficient performance by counsel, i.e., performance falling below an objective standard of reasonable representation, and (2) prejudice, i.e., a reasonable probability that but for counsel's errors, the proceeding's result would have been different. *Strickland v. Washington*, 466 U.S. 668, 687-688, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989), paragraphs two and three of the syllabus. There is a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance, and that strategy and tactical decisions exercised by defense counsel are well within the range of professionally reasonable judgment. *Strickland* at 699.

{¶21} Self-defense is an affirmative defense, and thus, the accused has the burden to prove it by a preponderance of the evidence. *State v. Smith*, 10th Dist. No. 04AP-189, 2004-Ohio-6608, ¶ 16. To establish self-defense through the use of deadly force, defendants must prove (1) they were not at fault in creating the situation giving rise to the

affray, (2) they had a bonafide belief that they were in imminent danger of death or great bodily harm and their only means of escape from such danger was the use of such force, and (3) they must not have violated any duty to retreat or avoid the danger. *State v. Robbins*, 58 Ohio St.2d 74, 388 N.E.2d 755 (1979), paragraph two of the syllabus. The trial court, as a matter of law, cannot give a jury instruction on an affirmative defense if a defendant fails to meet this burden. *State v. Cross*, 58 Ohio St.2d 482, 391 N.E.2d 319 (1979), fn. 5.

{¶22} Here, Tabasso called no witnesses, nor did he take the stand in his own defense. After reviewing the record, we conclude that Tabasso cannot even satisfy the first prong, i.e., he did not establish that he was not at fault in creating the situation. Tabasso went to Martaus's house at 4:30 a.m. Martaus testified that Tabasso began hitting him before he could even turn around to see who Shea was talking to.

{¶23} Assuming for the sake of argument that Shea was telling the truth about seeing Martaus hit Tabasso, that was not until after she was already in her car. Thus, she still would have been running to her car at that point when the fight began and would not have seen who threw the first punch. This is not sufficient to overcome Martaus's testimony that Tabasso hit him before he could even turn around to see who it was.

{¶24} Further, no evidence was produced at trial to show that Tabasso believed he was in imminent danger of death or great bodily harm that mandated the use of force to escape danger. Again, Shea's testimony that she saw Martaus hit Tabasso is not enough to

affirmatively establish that Tabasso truly believed he was in imminent danger. Finally, there was absolutely no evidence presented to show that Tabasso had no means of escape.

{¶25} After reviewing the record, we conclude that Tabasso failed to meet his burden to show evidence of possible self-defense. Having failed to meet this burden, the trial court had no basis to give an instruction on self-defense even if Tabasso's counsel had requested it. Accordingly, Tabasso's counsel's performance was not deficient.

{¶26} Tabasso's second assignment of error is overruled.

{¶27} Judgment affirmed.

It is ordered that appellee recover of appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____

MARY J. BOYLE, PRESIDING JUDGE

LARRY A. JONES, SR., J., and
KATHLEEN ANN KEOUGH, J., CONCUR