[Cite as *State v. Montanez*, 2014-Ohio-1723.]

# Court of Appeals of Ohio

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

### JOURNAL ENTRY AND OPINION
### No. 100013

## STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

## JOSE L. MONTANEZ II

DEFENDANT-APPELLANT

## JUDGMENT:
AFFIRMED

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-12-569439-A

**BEFORE:** Celebrezze, J., Boyle, A.J., and E.T. Gallagher, J.

**RELEASED AND JOURNALIZED:** April 24, 2014

**ATTORNEY FOR APPELLANT**

Rick L. Ferrara
Rick L. Ferrara, Esq.
2077 East 4th Street
Second Floor
Cleveland, Ohio   44114


**ATTORNEYS FOR APPELLEE**

Timothy J. McGinty
Cuyahoga County Prosecutor
BY:    Scott Zarzycki
          Mary Weston
Assistant Prosecuting Attorneys
The Justice Center
1200 Ontario Street
Cleveland, Ohio 44113

FRANK D. CELEBREZZE, JR., J.:

{¶1} Defendant-appellant, Jose L. Montanez II, appeals the judgment of the Cuyahoga County Court of Common Pleas following a bench trial, wherein the trial court found appellant guilty of felony murder, attempted murder, grand theft, and three counts of felonious assault. After a careful review of the record and relevant case law, we affirm appellant's convictions.

## I. Procedural History

{¶2} On December 4, 2012, the state indicted appellant on 15 counts in Cuyahoga C.P. No. CR-12-569439-A. The indictment alleged seven counts as to victim Jamelro Hicks: aggravated murder in violation of R.C. 2903.01(A), with one- and three-year firearm specifications (Count 1); murder in violation of R.C. 2903.02(B), with one- and three-year firearm specifications (Count 2); involuntary manslaughter in violation of R.C. 2903.04(A), with one- and three-year firearm specifications (Count 3); felonious assault in violation of R.C. 2903.11(A)(1), with one- and three-year firearm specifications (Count 4); felonious assault in violation of R.C. 2903.11(A)(2), with one- and three-year firearm specifications (Count 5); kidnapping in violation of R.C. 2905.01(A)(3), with one- and three-year firearm specifications (Count 6); and grand theft in violation of R.C. 2913.02(A)(1), with one- and three-year firearm specifications (Count 7).

{¶3} The state also alleged offenses as to victim Shannon Hinton, including: attempted murder in violation of R.C. 2923.02 and 2903.02(A), with one- and three-year firearm specifications (Count 8); felonious assault in violation of R.C. 2903.11(A)(1),

with one- and three-year firearm specifications (Count 9); felonious assault in violation of R.C. 2903.11(A)(2), with one- and three-year firearm specifications (Count 10); kidnapping in violation of R.C. 2905.01(A)(3), with one- and three-year firearm specifications (Count 11).

{¶4} Finally, the state alleged offenses as to victim Maurice Kimmie, including: attempted murder in violation of R.C. 2923.02 and 2903.02(A), with one- and three-year firearm specifications (Count 12); felonious assault in violation of R.C. 2903.11(A)(2), with one- and three-year firearm specifications (Count 13); kidnapping in violation of R.C. 2905.01(A)(3), with one- and three-year firearm specifications (Count 14); and having a weapon while under disability in violation of 2923.13 (Count 15).

{¶5} Appellant waived his right to a jury trial and tried his case to the bench. At the conclusion of the state's case-in-chief, the trial court dismissed Counts 11, 14, and 15. At the conclusion of trial, the court found appellant guilty of murder (Count 2), felonious assault (Count 4), felonious assault (Count 5), grand theft (Count 7), attempted murder (Count 12), and felonious assault (Count 13). The trial court further found appellant guilty of the attendant one- and three-year firearm specifications.

{¶6} Appellant was found not guilty of Count 1, aggravated murder; Count 3, involuntary manslaughter; Count 6, kidnapping; Count 8, attempted murder; Count 9, felonious assault; and Count 10, felonious assault.

{¶7} At sentencing, the trial court made certain findings on the record on the issue of merger. The court found that Count 2, murder, involved the shooting death of the

victim Jamelro Hicks, and Count 4, felonious assault, involved appellant beating, kicking, stomping, and pistol whipping Hicks after he had been shot. Thus, the trial court determined that Counts 2 and 4 involved two separate incidents and therefore did not merge.[1] However, the trial court held that Count 5, felonious assault, which was premised on the shooting of Hicks, merged with appellant's murder conviction.

{¶8} With respect to the offenses involving victim Maurice Kimmie, the trial court merged Count 12, attempted murder, with Count 13, felonious assault.[2]

{¶9} Subsequently, the trial court imposed an aggregate sentence of 31 years to life.[3]

## II. Factual History

{¶10} On December 2, 2011, Shannon Hinton was picked up by his lifelong friend, Jamelro Hicks, in Hicks's white van, and they went out for the evening. At approximately 4:00 a.m., they picked up Maurice Kimmie, who was just getting off work at the

---

[1] The trial court merged the gun specifications attached to Count 4 with the gun specifications attached to Count 2.

[2] The trial court merged the gun specifications attached to Count 12 with the gun specifications attached to Count 13.

[3] The trial court sentenced appellant to 15 years to life on Count 2, murder, and a consecutive sentence of 3 years for the attached firearm specifications, for a total of 18 years to life. On Count 4, felonious assault, the court sentenced appellant to 5 years, which was to be served consecutively to the murder charge. On Count 7, grand theft, appellant was sentenced to 18 months, which was to be served concurrently with Counts 2 and 4. As to Count 12, attempted murder, the trial court imposed a sentence of 5 years and a consecutive sentence of 3 years for the attached firearm specifications, for a total of 8 years. The court further ordered the sentence imposed for Count 12 to be served consecutively to Count 2.

Marathon gas station on East 55th Street. Hicks drove the three of them around to various places as they smoked marijuana during the early morning hours. At some point, Hicks arranged to meet appellant on Apple Avenue in Cleveland, Ohio. Hinton testified that he did not know appellant, nor did he know the purpose of the meeting at the time it was arranged, although there was a discussion in the van about needing more marijuana. Kimmie testified that he heard Hicks on the phone calling someone to arrange a meeting on Apple Avenue to buy a stronger form of marijuana referred to as "kush."

{¶11} When they arrived at Apple Avenue, Hicks, Hinton, and Kimmie waited in the van for a short time until appellant pulled up behind them in a small dark vehicle. According to Hinton and Kimmie, appellant exited his vehicle and immediately proceeded to the driver's side of the van to speak with Hicks. Hinton and Kimmie testified that they heard a dispute over the quality of the "kush" appellant was selling. After just a few words, appellant opened up the driver's side door, pulled Hicks from the van, and pointed a gun at him. Once Hicks was outside the van, a struggle over the gun ensued. Hinton and Kimmie testified that Hicks managed to knock the gun out of appellant's hand, and the gun hit and slid down the van's windshield.

{¶12} Hinton testified that, believing appellant was now disarmed, he felt it was safe to exit the van. Once outside the van, Hinton attempted to locate the firearm while Hicks continued to struggle with appellant in the street. When Hinton was unable to find the firearm, he began to run toward appellant and Hicks. However, Hinton testified that as soon as he turned toward them, appellant shot him in the upper chest. Despite being

shot, Hinton was able to run to safety. As he ran, Hinton heard additional shots being fired.

{¶13} Hinton testified that he did not witness anyone else get shot, and he believed the gun appellant used to shoot him was the same gun appellant originally pointed at Hicks when he removed Hicks from the van. After the shooting, Hinton was taken to the hospital where he remained for three to four days.

{¶14} Kimmie testified that he also exited the van to help Hicks once he saw the gun leave appellant's hands. However, Kimmie testified that by the time he managed to get out of the van, the gun was no longer on the windshield. According to Kimmie, appellant then "pistol whipped" Hicks, causing him to fall to the ground. Kimmie testified that appellant then shot Hicks approximately three times while he was lying on the ground. Contrary to Hinton's testimony, Kimmie testified that appellant shot Hicks before he turned and shot Hinton.

{¶15} Kimmie further testified that once appellant shot Hicks and Hinton, he walked toward Kimmie and pulled the trigger approximately five times, but the gun had no more bullets. At that time, appellant stopped to look for his car keys and money, which had fallen out of his pockets during the "tussle" with Hicks. Kimmie testified that he tried to help Hicks get back into the van so that they could drive to a nearby hospital. However, appellant forced them to exit the van before Kimmie managed to get Hicks inside, and appellant fled the scene in Hicks's van.

{¶16} On the day of the incident, construction worker Chris Shumney and his crew were installing a roof on a home near Apple Avenue. At some point, members of the construction crew heard what they believed were gun shots. Based on the statements of his crew, Shumney walked down the fence line of the job site and looked down a side street where he saw a man, later identified as appellant, wearing a Michigan jacket. Shumney indicated that the man in the Michigan jacket was with two other males near a white van.

{¶17} Shumney testified that he witnessed the man in the Michigan jacket engage in a scuffle with one of the other men in the middle of the street. According to Shumney, the man in the Michigan jacket was more aggressive and had the upper hand in the scuffle. During the altercation, Shumney witnessed the man in the Michigan jacket shoot the other man once while both men were standing and again when the injured man was on the ground. Although uncertain, Shumney believed he counted two or three gunshots during the scuffle. Shumney further stated that he did not see anyone other than the man with the Michigan jacket holding a gun.

{¶18} Shumney testified that the man in the Michigan jacket then opened the driver's door of a "dark colored" vehicle parked behind the white van. The man appeared to be looking for something inside the vehicle and then quickly exited the vehicle with the firearm still in his possession. He then walked back over to the man lying on the ground and kicked him in the head. At that point, the man in the Michigan jacket approached the second man, who was standing on the tree lawn near the parked

van. Shumney stated that the man in the Michigan jacket pointed the weapon directly at the second man and exchanged words, but he did not shoot. Thereafter, the man in the Michigan jacket got in the white van and drove away. Shumney stated that the only words he heard spoken during the entire incident were, "he tried to rob me," however, he did not know which of the men said those words.

{¶19} Shumney recalled that, in the midst of the incident, the man in the Michigan jacket stopped to pick up what appeared to be shell casings or money from the ground. After the man left in the van, Shumney and his crew pulled the victim of the shooting out of the street and waited for paramedics to arrive.

{¶20} On December 2, 2011, Curtis Lovell was visiting his sister at her home on Apple Avenue when he heard "popping noises." Lovell testified that he immediately looked out the front window and observed a tall man beating another man on the ground. He described it as "pounding" and "kicking," and "making sure he didn't get up." Lovell stated that the altercation took place on the tree lawn near a white van.

{¶21} Danny Ray lived on Apple Avenue and also heard what he believed to be gunshots. Ray testified that when he looked out his window, he observed a Hispanic man with a ponytail attempting to shoot another man with a gun. According to Ray, the man being shot at tried to get into the passenger side of a white van while the shooter was attempting to prevent him from entering the van by stomping and kicking him. Ray stated that the Hispanic man was the only person he witnessed holding a gun.

{¶22} Crystal Doss lived on Apple Avenue. On the day of the incident, she heard two or three gunshots. She looked outside and saw three men facing each other arguing. She turned to tell her mother what was happening and, when she looked back, she saw one man trying to get into the passenger side of a white van. She witnessed a man with a ponytail repeatedly kicking the man who was trying to get into the van.

{¶23} Johanna Herandez testified that at approximately 3:30 p.m. on December 2, 2011, she heard popping sounds that could have been gunshots. She looked outside and saw a white van parked on the street. She saw a man dragging another man on the ground and stomping him vigorously in the chest area. She described the assailant as a tall man with frizzy hair and a ponytail. Hernandez testified that the assailant then got into the van and drove away.

{¶24} Officer James Thomas of the Cleveland Police Department responded to West 44th Street and Lorain Avenue, where he observed Shannon Hinton with a gunshot wound to the chest. Hinton told the officers another person was shot around the corner on Apple Avenue. Officer Thomas left Hinton with other officers and went to Apple Avenue where he observed Hicks lying on the tree lawn. Officer Thomas secured the scene and checked Kimmie and Hicks for weapons. Officer Thomas testified that he was unable to locate any weapons on their persons. Furthermore, Officer Thomas was unable to locate any weapons in the general area of the shooting.

{¶25} Officer Joseph Bovenzi of the Cleveland Police Department testified that he responded to Apple Avenue after hearing a dispatch for two males shot. On arrival, he

assisted in the interview of Kimmie. Officer Bovenzi learned that the suspect had arrived in the black Honda that was still on the scene and fled in Hicks's white van. With that information, Officer Bovenzi looked inside the Honda and discovered an envelope with a return address of 6818 Claasen Avenue, Cleveland, Ohio. As a result, Officer Bovenzi requested and was granted permission to check the address displayed on the envelope. When he arrived at the residence at issue, he located Hicks's white van parked in the driveway behind the house. Officer Bovenzi testified that, on inspecting the van, he discovered an unloaded .38-caliber revolver positioned on the outside of the van between the hood area and the windshield. Additionally, Officer Bovenzi spoke to Amber Riley, a resident of the downstairs unit of the house.

{¶26} Detective Dale Moran responded to the Claasen Avenue home to assist Officer Bovenzi. Inside the upstairs unit, Det. Moran noticed a garbage can containing a blue Michigan jacket and some boots. The area was secured to await the arrival of a crime scene detective.

{¶27} Detective John Reidthaler testified that he processed the Apple Avenue crime scene. He took photos and collected evidence. He processed the black Honda for prints and collected money from the street. Det. Reidthaler further discovered eyeglasses underneath a nearby truck, a black hat, a GM car key, a Honda car key, and a pile of the victim's clothing that had been removed from Hicks by EMTs. Det. Reidthaler went to the Claasen Avenue address where appellant lived. He photographed the van in the driveway and the location of the firearm on the windshield. Inside appellant's apartment,

Det. Reidthaler collected bullets, syringes, and drug paraphernalia. He also collected and photographed the clothing in the trash can, specifically a gray hoodie, brown boots, and a blue Michigan jacket. The clothing found in appellant's residence contained blood matching the DNA profile for Hicks.

{¶28} Detective James Kooser conducted a forensic comparison of the .38-caliber revolver discovered on the white van and the morgue bullet and hospital bullet removed from Hicks. Det. Kooser determined that the bullets retrieved from Hicks could not have been fired from the recovered firearm.

{¶29} Amber Riley testified that she was living in the downstairs unit at 6818 Claasen Avenue. She knew appellant because he lived in the upstairs unit. Riley further stated that she frequently purchased heroin from appellant. On the afternoon of December 2, 2011, appellant came home in a white van Riley had never seen before. He sped into the backyard, jumped out of the van, and walked upstairs. Riley heard appellant on the phone saying, "Help a brother out, I just shot somebody. I think he's dead. They tried to rob me." Later, appellant came downstairs with two plastic bags containing drug scales. Appellant gave Riley the drug scales to hold and told her that the police were looking for him.

{¶30} Dr. Thomas Gilson performed Hicks's autopsy on December 3, 2011. In the course of establishing the cause and manner of Hicks's death, Dr. Gilson discovered three gunshot wounds. He identified gunshot wound A in the armpit area and discussed the black discoloration around the wound. The area was singed or burned, indicating the

gun was pressed against Hicks's body when it was fired. Dr. Gilson testified that the bullet went through the victim's lung and ribs before exiting the body. Gunshot wound B was in the right shoulder. Dr. Gilson testified that no burning was present in gunshot wound B. The bullet entered into the chest cavity in a downward direction and did not exit the body. Gunshot wound C was in the victim's back. That bullet traveled in a downward direction striking the spine and lodging in the pelvic area. The surface of the wound had abrading and scraping from unburned fragments of gunpowder hitting the skin. That indicated a close muzzle-to-target distance of, at the most, 24 inches. In addition to the gunshot wounds, Dr. Gilson testified that he also found at least five areas of blunt force injury to Hicks's head. He testified that the cause of death was the three gunshot wounds.

{¶31} Lisa Przepszny examined the jacket worn by Hicks during the homicide and found defects or holes in the jacket that corresponded with the victim's gunshot wounds. She found a fourth defect from an additional gunshot that grazed through two parts of the jacket without hitting the victim.

{¶32} Detective Arthur Echols testified to his investigation in the case. He introduced a video that was turned over to Detective Dale Moran from a witness named Lee Moore. Both parties stipulated to the authenticity of the video. The video was taken from 4300 Apple Avenue and captured a portion of the incident.

{¶33} Appellant testified on his own behalf and maintained that he acted in self-defense during the altercation with Hicks, Hinton, and Kimmie. Appellant testified

that on December 2, 2011, he arranged to buy heroin from Hicks on Apple Avenue. In preparation for the purchase, appellant brought $1,200 with him to the scene. When the heroin deal fell through due to its low quality, appellant returned to his vehicle to retrieve a sample of "kush" to give to Hicks without charge. Appellant testified that when he exited his vehicle, Hicks and Kimmie approached him and Hicks put a gun to his chest stating, "I need that. I need that [$1,200]." According to appellant, Hicks then reached into appellant's pocket to remove his money. At that time, Hicks discovered that appellant had a firearm in his possession.[4]

{¶34} Appellant testified that while Hicks's left hand was still inside his coat pocket, he attempted to grab the gun from Hicks's right hand. Appellant and Hicks struggled over control of the weapon. Appellant stated that, during the struggle, he managed to turn Hicks's wrist and fire two shots, one of which struck Hicks near his right armpit. Once shot, Hicks pushed appellant away, and appellant fell to the ground. According to appellant, Hicks dropped his gun during the struggle, and it landed on the tree lawn near the passenger's side of the van. Appellant stated that Hicks attempted to dive toward the gun, but he managed to "put his left leg out and push [Hicks]," causing Hicks to "flip over" into the street. Appellant then picked up the gun and shot Hicks two times while Hicks was lying on the ground. Appellant stated that he shot Hicks two

---

[4] Appellant testified that the weapon in his possession had been purchased earlier that day and was unloaded.

additional times because he "did not want [Hicks] to regain control of the weapon and shoot [him]."

{¶35} Appellant stated that, after seeing movement to his right, he turned and shot Shannon Hinton, who was running toward him. Appellant testified that he did not know if Hinton had a weapon but "was not taking any chances." Appellant stated that he then turned back to Hicks and, after exchanging words, kicked him in the head and hit him with the butt of the gun.

{¶36} Appellant then walked over to Kimmie, who was standing near the white van. Appellant admitted to pointing the gun at Kimmie and depressing the trigger six times; however, the gun had no more bullets. Appellant briefly looked for his keys and money that had fallen to the ground. When he was unable to find his keys, he walked to the white van, removed Hicks, who was also trying to get into the van, and drove off in the van.

{¶37} Appellant identified the unloaded firearm found on the windshield of the white van as the firearm that was in his pocket at the time of the incident. He admitted that he did not know how the gun ended up on the windshield of the van, but believed it may have fallen out during the struggle with Hicks. Finally, appellant admitted that he was wearing a blue Michigan jacket and had his hair in a ponytail during the incident.

{¶38} Appellant brings this timely appeal, raising four assignments of error for review:

> I. The trial court erred in failing to merge all allied offenses of similar import at sentencing.

II.   The manifest weight of the evidence did not support appellant's conviction for murder, attempted murder, or felonious assault.

III.   Insufficient evidence supported appellant's convictions.

IV.   The trial court committed plain error in applying the self-defense theory and felony murder charge.

For the purposes of judicial clarity, we consider appellant's assignments of error out of order.

### III.   Law and Analysis

### A. Manifest Weight of the Evidence

{¶39} In his second assignment of error, appellant argues that his felony murder, attempted murder, and felonious assault convictions are against the manifest weight of the evidence.

{¶40} "A manifest weight challenge * * * questions whether the prosecution met its burden of persuasion." *State v. Ponce*, 8th Dist. Cuyahoga No. 91329, 2010-Ohio-1741, ¶ 17, quoting *State v. Thomas*, 70 Ohio St.2d 79, 80, 434 N.E.2d 1356 (1982). The manifest-weight-of-the-evidence standard of review requires us to review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Penque*, 8th Dist. Cuyahoga No. 99209, 2013-Ohio-4696, ¶ 49. Reversing a conviction as being against the manifest weight of the evidence and ordering a new trial is reserved for only those

"exceptional cases in which the evidence weighs heavily against the conviction." *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997).

{¶41} In challenging the weight of the evidence supporting his felony murder, attempted murder, and felonious assault convictions, appellant argues that the testimony presented at trial demonstrated that Hicks, Kimmie, and Hinton were the initial aggressors and that he acted in self-defense.[5]

{¶42} After reviewing the record in its entirety, it is evident that the trial court gave very little weight to the testimony of Hinton and Kimmie concerning the circumstances that gave rise to the altercation between Hicks and appellant. In fact, the trial court found appellant's testimony regarding who was at fault in creating the situation to be more credible, stating, "I believe, an altercation actually started by the actions of the people in the white car, and that to a large extent, [appellant] did operate in self-defense." Nevertheless, the trial court determined that, while appellant may have acted in self-defense to an extent, he also exceeded the scope of the defense as it related to his conduct towards Hicks and Kimmie.[6]

---

[5] "[W]hen reviewing a claim by a defendant that evidence supports his claim of self-defense, the manifest-weight standard is the proper standard of review because a defendant claiming self-defense does not seek to negate an element of the offense charged but rather seeks to relieve himself from culpability." *State v. Wilson*, 8th Dist. Cuyahoga No. 97350, 2012-Ohio-1952, ¶ 39, citing *State v. Dykas*, 185 Ohio App.3d 763, 2010-Ohio-359, 925 N.E.2d 685, ¶ 18 (8th Dist.).

[6] The trial court's partial acceptance of appellant's testimony and claim of self-defense is evidenced by its decision to find him not guilty of attempted murder or felonious assault with respect to the shooting of Shannon Hinton.

**{¶43}** Self-defense is an affirmative defense, and thus the accused has the burden to prove it by a preponderance of the evidence. *State v. Tabasso*, 8th Dist. Cuyahoga No. 98248, 2012-Ohio-5747, ¶ 21, citing *State v. Smith*, 10th Dist. Franklin No. 04AP-189, 2004-Ohio-6608, ¶ 16.

**{¶44}** To establish self-defense through the use of deadly force, defendants must prove (1) they were not at fault in creating the situation giving rise to the affray, (2) they had a bona fide belief that they were in imminent danger of death or great bodily harm and their only means of escape from such danger was the use of such force, and (3) they must not have violated any duty to retreat or avoid the danger. *State v. Owens*, 8th Dist. Cuyahoga No. 98165, 2012-Ohio-5887, ¶ 12, citing *State v. Williford*, 49 Ohio St.3d 247, 551 N.E.2d 1279 (1990). Further, the elements of self-defense are cumulative and, if the defendant failed to prove any one of the elements by a preponderance of the evidence, he failed to demonstrate that he acted in self-defense. *Id.*

**{¶45}** After a careful consideration of the record in its entirety, we find that the trier of fact reasonably could have concluded that appellant exceeded the scope of any self-defense privilege he may have had in this matter.

**{¶46}** Assuming, as the trial court ultimately determined, that appellant was not at fault in creating the situation giving rise to the affray, whether appellant had a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape from such danger was the use of force, remained as questions for the trier of fact to consider. As trier of fact, the trial court was free to believe or disbelieve

all or any of the testimony presented on these remaining issues. *State v. Matthews*, 10th Dist. Franklin No. 11AP-532, 2012-Ohio-1154, ¶ 46, citing *State v. Jackson*, 10th Dist. Franklin No. 01AP-973, 2002-Ohio-1257.

{¶47} Under the totality of the circumstances presented herein, we are unable to conclude that the trial court lost its way in rejecting appellant's bona fide belief that he was in imminent danger of death or great bodily harm at the time he fired the second and third shots into Hicks and when he attempted to shoot an unarmed Kimmie. While appellant may have presented credible evidence that he was in imminent danger of death or great bodily harm at the time he and Hicks struggled over the firearm, he was unable to sufficiently demonstrate that Hicks continued to pose such a danger at the time he fired the second and third shots into Hicks. Appellant's own testimony established that, at the moment he fired those shots, Hicks was lying on the ground unarmed and badly injured. Similarly, there is no basis in the record for appellant to argue that he was in fear of imminent harm at the time he approached Kimmie and pulled the trigger. In fact, appellant described Kimmie as "cowering" behind the van at the time he approached him. Such a statement evidences Kimmie's intent to avoid any further interaction with appellant, while simultaneously evidencing appellant's vengeful state of mind once he gained the upper hand in the altercation.

{¶48} Moreover, the testimony presented at trial reasonably established that appellant had other means of escape besides the use of deadly force, particularly where appellant gained control over the weapon and had the apparent ability to flee the scene at

that point. We are mindful that "[i]n most circumstances, a person may not kill in self-defense if he has available a reasonable means of retreat from the confrontation." *Williford*, 49 Ohio St.3d at 250, 551 N.E.2d 1279 (1990).

**{¶49}** In our view, the trial court reasonably determined that the death of Hicks and the attempted murder of Kimmie were not created by appellant's inability to escape without using deadly force, but instead were created by appellant's admitted anger over their unsuccessful attempt to rob him. Thus, the record contains credible evidence that appellant had the means to safely retreat once he successfully retrieved the gun from Hicks's possession.

**{¶50}** Because the trial court was in the best position to determine the credibility of each witness by taking into account inconsistencies, as well as the manner and demeanor of the witnesses, we cannot conclude that this record presents a scenario where the trier of fact clearly lost its way in rejecting appellant's claim of self-defense. Accordingly, appellant's convictions are not against the manifest weight of the evidence.

**{¶51}** Appellant's second assignment of error is overruled.

### B. Sufficiency of the Evidence

**{¶52}** In his third assignment of error, appellant argues that his murder conviction was not supported by sufficient evidence.

**{¶53}** When reviewing a challenge of the sufficiency of the evidence, a reviewing court examines the evidence admitted at trial and determines whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable

doubt. *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.* A sufficiency challenge requires us to review the record to determine whether the state presented evidence on each of the elements of the offense. *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). A reviewing court is not to assess "whether the state's evidence is to be believed, but whether, if believed, the evidence against a defendant would support a conviction." *State v. Thompkins*, 78 Ohio St.3d 380, 390, 678 N.E.2d 541 (1997).

{¶54} Under R.C. 2903.02(B), "[n]o person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree." In this case, the underlying felony giving rise to the felony murder is the felonious assault against Hicks, as charged in Count 3 of the indictment.

{¶55} Under R.C. 2903.11(A)(2), "[n]o person shall knowingly * * * [c]ause or attempt to cause physical harm to another * * * by means of a deadly weapon or dangerous ordnance." An individual "acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist." R.C. 2901.22(B).

**{¶56}** It is common knowledge that a firearm is an inherently dangerous instrumentality, the use of which is reasonably likely to produce serious injury or death. *State v. Willis*, 8th Dist. Cuyahoga No. 99735, 2014-Ohio-114, ¶ 25, citing *State v. Widner*, 69 Ohio St.2d 267, 270, 431 N.E.2d 1025 (1982). Moreover, "shooting a gun in a place where there is risk of injury to one or more persons supports the inference that the offender acted knowingly." *State v. Hunt*, 8th Dist. Cuyahoga No. 93080, 2010-Ohio-1419, ¶ 19, citing *State v. Brooks*, 44 Ohio St.3d 185, 192, 542 N.E.2d 636 (1989).

**{¶57}** Here, there is no dispute that appellant fired the shots that struck and ultimately killed Hicks. However, appellant argues that because he acted in self-defense, there can be no murder or underlying felonious assault conviction. We disagree.

**{¶58}** As discussed, the trial court ultimately did not accept appellant's position that he acted in self-defense with respect to the shooting death of Hicks. While the court acknowledged that the incident was likely created by Hicks's attempt to rob appellant and that the first gunshot may have been made during the struggle over the weapon, the court clearly indicated that the second and third shots fired into Hicks exceeded the scope of self-defense.

**{¶59}** In light of the above, after viewing the evidence in a light most favorable to the prosecution, we conclude that any rational trier of fact could have found the essential elements of murder and felonious assault proven beyond a reasonable doubt.

**{¶60}** Appellant's third assignment of error is overruled.

## C. Self-Defense

**{¶61}** In his fourth assignment of error, appellant argues that the trial court committed plain error in misapplying the self-defense doctrine. Because appellant merely incorporates the arguments previously raised in his sufficiency and manifest weight assignments of error, we find no merit to appellant's position that the trial court misapplied the self-defense doctrine. As discussed, the trial court properly considered the actions of Hicks, Hinton, and Kimmie in reaching its verdict and determined that, in some instances, appellant's conduct went well beyond the scope of self-defense.

**{¶62}** Appellant's fourth assignment of error is overruled.

## D. Allied Offenses

**{¶63}** In his first assignment of error, appellant argues that the trial court erred in failing to merge all allied offenses of similar import at sentencing. Specifically, appellant contends that the trial court committed plain error in failing to merge Count 4, felonious assault, with Count 2, felony murder. We disagree.

**{¶64}** As stated, the trial court found appellant guilty of four counts involving Jamelro Hicks: felony murder in violation of R.C. 2903.02(B) (Count 2); felonious assault by causing serious physical harm in violation of R.C. 2903.11(A)(1) (Count 4); felonious assault with a deadly weapon in violation of R.C. 2903.11(A)(2) (Count 5); and grand theft in violation of R.C. 2913.02(A)(1) (Count 7).

**{¶65}** At appellant's sentencing hearing, the trial court addressed the issue of merger and determined that Count 5, felonious assault, and Count 2, felony murder, were

allied offenses of similar import subject to merger for the purposes of sentencing. However, the court refused the defense's request to merge Count 4, felonious assault, with the felony murder count. The court explained:

> Now, by the Court's analysis here, the court believes that Count 4, felonious assault, the court found the defendant guilty for the acts involving the physical beating that was rendered to the victim Mr. Hicks after the time that he was shot and that he was either near or in the vehicle or on the tree lawn. The court finds that that's a separate animus and the court will sentence that count separately.
>
> * * *
>
> T]he court's analysis is this, is that Count 4 is being considered separate because the defendant had already committed acts that would result in — end in the result of the murder of the [victim] as to Count 2. The fight had stopped. The defendant is then trying to flee the area. The defendant loses his keys in the fight, cannot find access to his car, and then takes the car that belonged to Mr. Hicks and Mr. Hicks was near — or on the vehicle, there is a resulting continuation of the fight once it had stopped. And that at that time he was severely kicked and beaten. The parties, witnesses described that act by the defendant as to this victim.
>
> The Court believes that there is a separate animus as to Count 4.

{¶66} In challenging the trial court's finding, appellant argues that all of his crimes were committed during a continuous course of conduct. Thus, appellant argues that his convictions for murder and felonious assault must merge. While we agree that appellant's conviction for felonious assault pursuant to R.C. 2903.11(A)(2) was required to merge with his murder conviction, we are unable to reach the same conclusion with respect to his R.C. 2903.11(A)(1) felonious assault conviction, as set forth in Count 4 of the indictment.

{¶67} Where the same conduct by the defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one. R.C. 2941.25(A). Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the defendant may be convicted of all of them. R.C. 2941.25(B).

{¶68} Thus, there is a two-part test to determine if offenses should be merged. First, the elements of the two crimes are compared. *State v. Williams*, 134 Ohio St.3d 482, 2012-Ohio-5699, 983 N.E.2d 1245, ¶ 17, citing *State v. Blankenship*, 38 Ohio St.3d 116, 117, 526 N.E.2d 816 (1988). The elements of the two offenses were previously considered only in the abstract but are now compared in the factual context of the defendant's conduct. *Id.* at ¶ 20; *State v. Johnson*, 128 Ohio St.3d 153, 2010-Ohio-6314, 942 N.E.2d 1061, syllabus, where a majority overruled *State v. Rance*, 85 Ohio St.3d 632, 1999-Ohio-291, 710 N.E.2d 699. If the crimes correspond to a sufficient degree, then crimes are allied offenses of similar import, and the court must proceed to the second step. *See Williams* at ¶ 17.

{¶69} In the second step, the defendant's conduct is also reviewed, and only if the crimes were committed separately or there was a separate animus for each crime (or they are of dissimilar import under the first prong) can the defendant be sentenced for both.

*Id.* In reviewing a trial court's merger decision, the appellate court conducts a de novo review of the trial court's application of the law to the facts. *Id.* at ¶ 27-29.

{¶70} Thus, as the reviewing court, we first determine "whether it is possible to commit one offense and commit the other with the same conduct, not whether it is possible to commit one without committing the other." *Johnson* at ¶ 48 (Brown, J., plurality). "If the multiple offenses can be committed by the same conduct, then the court must determine whether the offenses were committed by the same conduct, i.e., 'a single act, committed with a single state of mind.'" *Id.* (Brown, J., plurality), quoting *State v. Brown*, 119 Ohio St.3d 447, 2008-Ohio-4569, 895 N.E.2d 149. Due to the subjective nature of the analysis based on the facts of each case, some crimes may be allied offenses in certain cases, but not in another case under a different set of facts. *Id.* at ¶ 52.

{¶71} Here, the parties concede that felony murder and felonious assault in violation of R.C. 2903.11(A)(1) can be committed with the same conduct under the first prong of the merger test. Thus, the sole issue here is whether the two offenses were committed separately or with separate animus. Animus means "purpose, or more properly, immediate motive" and can be inferred from the surrounding circumstances. *State v. Logan*, 60 Ohio St.2d 126, 131, 397 N.E.2d 1345 (1979).

{¶72} In the instant case, the conduct supporting appellant's convictions for felony murder and the felonious assault as indicted in Count 4 were separated by time and motive. Collectively, the testimony at trial established that once appellant completed the

act of shooting Hicks and Hinton, his focus turned to fleeing the scene. Appellant testified that when he attempted to flee in his own vehicle, he was unable to locate his car keys. Panicked, appellant decided to steal Hicks's van. The record reflects that in order to complete this act, appellant removed Hicks from the van and "kicked," "stomped," and "pistol whipped" Hicks in the process. Specifically, Chris Shumney, Curtis Lovell, Danny Ray, Crystal Doss, and Johanna Herandez each testified that, following the sounds of gunshots, they observed appellant vigorously and repeatedly kicking Hicks in the head and chest area near the white van. Moreover, appellant himself admitted to kicking Hicks in the head and hitting him with the butt of the gun after the shooting was completed.

{¶73} Thus, the facts set forth at trial support the trial court's determination that the physical force used against Hicks following the actual shooting was separated in time and was committed with a separate state of mind, i.e., to flee the scene in the stolen van. As a result, the offenses do not merge for the purposes of sentencing. Accordingly, the trial court did not err in failing to merge these offenses at sentencing.

{¶74} Appellant's first assignment of error is overruled.

{¶75} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's convictions having

been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

FRANK D. CELEBREZZE, JR., JUDGE

MARY J. BOYLE, A.J., and
EILEEN T. GALLAGHER, J., CONCUR