[Cite as *In re N.S.*, 2016-Ohio-492.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
No. 102801

# IN RE: N.S.
# A Minor Child

## JUDGMENT:
AFFIRMED

Civil Appeal from the
Cuyahoga County Court of Common Pleas
Juvenile Division
Case No. DL-14-115192

**BEFORE:** Kilbane, J., E.A. Gallagher, P.J., and McCormack, J.

**RELEASED AND JOURNALIZED:** February 11, 2016

**ATTORNEY FOR APPELLANT**

Stephanie L. Lingle
1360 East 9th Street
Suite 910
Cleveland, Ohio 44114


**ATTORNEYS FOR APPELLEE**

Timothy J. McGinty
Cuyahoga County Prosecutor
Hannah M. Smith
Assistant County Prosecutor
The Justice Center - 9th Floor
1200 Ontario Street
Cleveland, Ohio 44113

**Also listed:**

Yvonne C. Billingsley
C.C.D.C.F.S.
3955 Euclid Ave
Cleveland, Ohio    44115

MARY EILEEN KILBANE, J.:

**{¶1}** Appellant, N.S. ("N.S."), appeals from the judgment of the Cuyahoga County Common Pleas Court, Juvenile Division, that adjudicated him delinquent in connection with a charge of felonious assault. Having reviewed the record and the controlling case law, we affirm.

**{¶2}** N.S. was charged with one count of felonious assault, in violation of R.C. 2903.11. The charge is in connection with an alleged attack on T.T. ("T.T."), a fellow student, who was an adult at the time of the incident. N.S. denied the charge, and the matter proceeded to trial over several days from February 17, 2015 to March 5, 2015.

**{¶3}** T.T. testified that in late November 2014, he heard that N.S. had been talking about him. T.T. and another friend decided to confront N.S. and one of N.S.'s friends over the rumors. As a result of this confrontation, N.S. said that he wanted to "work," i.e., fight. The two teens then had a brief fight at a nearby gas station. T.T. admitted that he had been suspended following this fight, and he then threatened to shoot N.S. and "shoot up his house." T.T. also admitted that he had previously been the victim of a gunshot.

**{¶4}** T.T. further testified that, after the fight with N.S. at the gas station, he was suspended a second time for an incident where he confronted N.S. outside of a classroom. A week or two later, T.T. again heard through friends that N.S. wanted to fight him. At

that point, T.T. decided that he had been disrespected and that they had to fight for the third time.

{¶5} The two continued their dispute through social media and text messages. In a text message dated December 6, 2014, T.T. indicated that if N.S. stabs him, he would shoot N.S., but T.T. insisted that he did not actually have a gun. In another exchange, T.T. continued to threaten N.S. that he would "f * * * him up, and beat his ass." T.T. also taunted N.S. for not having a gun, and N.S. replied, "why waste bullets on [me]." In response, T.T. texted, "you really about to get killed," and "can't nobody save you this time." To that, N.S. replied, "u wanna kill me that's cool. I had a good life." As the exchanges continued, N.S. said, "lemme go about my life. N * * * * ain't trying to beef with you sir." T.T. continued that he would "drop" N.S. in 30 seconds, and called N.S. weak. In response to this, N.S. said, "yeah I'm weak that's why I don't fight. I ain't trying to work [fight] and you are about to paralyze me but if you got to prove something to yourself tough guy you do that." T.T. concluded by threatening to beat N.S. "to death." Ultimately, N.S. indicated that he would fight T.T. at the same gas station where they had previously fought.

{¶6} During the school day on December 8, 2014, one of the teachers became aware of the ongoing dispute and had the two speak with the school security officer. T.T. and N.S. were both searched for weapons and then dismissed from school. T.T. called family members to pick him up but could not get a ride home. He testified that he waited approximately 15 minutes after N.S. left the building, before deciding to walk to

the gas station where they had previously fought. The school surveillance video showed that he left the building four minutes after N.S., however. T.T. testified that he asked N.S. if he still wanted to fight, and N.S. said that he does not fight, but instead stabs people, then ran at T.T., attacking him with a large knife. T.T. testified that N.S. slashed him on his shoulder and arm and cut his leg. T.T. bit N.S. on the shoulder in order to get away. T.T. denied instigating the fight, but he admitted that he grabbed N.S.'s cell phone.

{¶7} Bedford police detective Buck Kidd ("Detective Kidd") responded to the scene. T.T. was still at the scene, but N.S. fled before the police arrived. T.T. was transported to the hospital by ambulance. Detective Kidd and Bedford police officer John Lobenthal ("Officer Lobenthal") testified that they responded to N.S.'s house, and N.S. immediately surrendered. According to Detective Kidd, N.S. admitted that he had the knife in the morning before the assault, and hid it near the gas station along his route home, in the event that he needed it during a fight with T.T. After the attack, N.S. hid it in his backyard. N.S. produced the knife for the officers.

{¶8} At the close of the state's case, N.S. moved for a judgment of acquittal. The trial court denied the motion and N.S. presented testimony from Bedford police officer Paul Kellerman ("Officer Kellerman"). Officer Kellerman testified that during his investigation of the incident, he learned that T.T. pushed N.S. a number of times and took N.S.'s phone before N.S. finally retaliated.

{¶9}  D.P., another classmate of N.S., testified that after T.T. and N.S. were suspended, T.T. followed N.S. and tried to catch up with him in order to fight with him. T.T. eventually caught up with N.S., but N.S. said that he did not want to fight. According to D.P., T.T. kept "messing with" N.S., pushed him, and took his cell phone. They began to tussle as N.S. tried to get the phone back.   N.S. then reached for the knife that was on the ground.   T.T. continued to come at N.S. and "mess with him."   In response, N.S. told T.T. to chill out.   T.T. bit N.S., and N.S. cut T.T. then fled.   D.P. admitted that T.T. did not have a weapon and did not threaten to shoot N.S. at the time of this fight.

{¶10} N.S. testified that his problems with T.T. began at the start of the school year when he developed a crush on B.J., who he later learned was T.T.'s girlfriend.   N.S. subsequently ended the friendship, but B.J. became angry that N.S. was not speaking with her, so during class in November, she pushed him off a desk.   At that point, N.S. called her a "stupid bitch," and T.T. confronted N.S. over this insult and repeatedly threatened N.S.   A few days later, T.T. was waiting for him outside of one of his classes.   T.T. threatened him and had to be restrained by a teacher.   The two met with the principal to mediate their dispute, then were both sent home for the day.

{¶11} Following that meeting with the principal, T.T. sent N.S. a series of threatening messages.   N.S. brought the matter to the attention of his mother, who said that she would discuss the matter with the principal.   His mother also had N.S. stay in the house over the weekend in order to prevent him from being victimized.   N.S.

testified that because he had seen T.T. with a gun during a football game, and had also seen Instagram photos of him with a gun, he became very frightened.

{¶12} On the following Monday morning, N.S. went to the principal's office to report the social media threats he had received from T.T., but T.T. spotted N.S. coming out of the office and became infuriated. During that day, T.T. attempted to come at him. Later in the day, the two spoke with the security officer and were sent home. N.S. was permitted to stop at the cafeteria first so that the two would not leave at the same time. When N.S. signed out to leave, he notice that T.T., who had signed out earlier, was still in the building. N.S. stopped briefly at the gas station then continued home on his usual route, but he noticed that T.T., who does not live near him, was following him. As N.S. continued home, he next observed T.T. coming at him. N.S. testified that he had hidden his father's knife along the route home, in case there was trouble, and hid it in his sweatshirt. As he continued on, he observed T.T. and D.P. approaching. T.T. was yelling and wanted to fight, and grabbed N.S. by the shoulder, flinging him around. N.S.'s cell phone fell out of his pocket and T.T. grabbed it. N.S. got the phone back and T.T. grabbed him in a bear hug and bit his shoulder. At that point, N.S. testified that he grabbed his knife and stuck T.T. in the leg.

{¶13} On March 19, 2015, the trial court found N.S. delinquent as charged. The court ordered him to serve 12 months of detention, which the court suspended, and to complete 30 hours of community service and 3 months of low risk community control sanctions. The court noted that N.S. is "not a bad kid," and had tremendous family

support. The court explained that it understood that N.S. had been bullied, but it noted that chaos would ensue if everyone responded to threats in the manner that N.S. had responded.

{¶14} N.S. now appeals and assigns the following sole assignment of error for our review:

Assignment of Error

The trial court's failure to find that N.S. acted in self-defense was against the manifest weight of the evidence.

{¶15} Within this assignment of error, N.S. argues that the manifest weight of the evidence presented at trial demonstrates that he met his burden of showing that he acted in self-defense, because he established by a preponderance of the evidence that he was not at fault in creating the violent situation, he had a bona fide belief that he was in imminent danger of death or bodily harm, and he did all that he could to retreat and avoid the danger.

{¶16} In *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, the Ohio Supreme Court addressed the standard of review for a criminal manifest weight challenge, as follows:

> The criminal manifest-weight-of-the-evidence standard was explained in *State v. Thompkins* (1997), 78 Ohio St.3d 380, 1997- Ohio-52, 678 N.E.2d 541. In *Thompkins*, the court distinguished between sufficiency of the evidence and manifest weight of the evidence, finding that these concepts differ both qualitatively and quantitatively. *Id*. at 386, 678 N.E.2d 541. The court held that sufficiency of the evidence is a test of adequacy as to whether the evidence is legally sufficient to support a verdict as a matter of law, but weight of the evidence addresses the evidence's effect of inducing belief. *Id*. at 386-387, 678 N.E.2d 541. In other words, a reviewing court

asks whose evidence is more persuasive — the state's or the defendant's? * * * "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a 'thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony." *Id.* at 387, 678 N.E.2d 541, citing *Tibbs v. Florida* (1982), 457 U.S. 31, 42, 102 S.Ct. 2211, 72 L.Ed.2d 652.

**{¶17}** In addition, an appellate court may not merely substitute its view for that of the factfinder, but must find that "'in resolving conflicts in the evidence, the factfinder clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172,485 N.E.2d 717 (1st Dist.1983). Accordingly, reversal on manifest weight grounds is reserved for "'the exceptional case in which the evidence weighs heavily against the conviction.'" *Id.*, quoting *Martin*. In addition, this court must remain mindful that the weight to be given the evidence and the credibility of the witnesses are matters left primarily to the factfinder. *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967). Reversing an adjudication on the manifest weight of the evidence requires the unanimous concurrence of all three appellate judges. *Thompkins* at paragraph four of the syllabus.

**{¶18}** In this matter, N.S. was adjudicated delinquent in connection with a charge of felonious assault. R.C. 2903.11 defines this offense as follows:

No person shall knowingly do either of the following:

(1)     Cause serious physical harm to another   * * *;

(2)     Cause or attempt to cause physical harm to another * * * by means of a deadly weapon or dangerous ordnance.

**{¶19}** R.C. 2901.05 governs affirmative defenses and places the burden of going forward with the evidence and the burden of proof, by a preponderance of the evidence, upon the accused. In order to establish a self-defense claim, the defendant must demonstrate by a preponderance of the evidence that: (1) he was not at fault in creating the situation giving rise to the affray; (2) he had a bona fide belief that he was in imminent danger of great bodily harm and that his only means of escape from such danger was in the use of such force; and (3) he must not have violated any duty to retreat or avoid danger. *State v. Williford*, 49 Ohio St.3d 247, 249, 551 N.E.2d 1279 (1990); *see also State v. Robbins*, 58 Ohio St.2d 74, 388 N.E.2d 755 (1979), paragraph two of the syllabus. The elements of self-defense are cumulative and "'[i]f the defendant fails to prove any one of these elements by a preponderance of the evidence, he has failed to demonstrate that he acted in self-defense.'" *Williford*, quoting *State v. Jackson*, 22 Ohio St.3d 281, 284, 490 N.E.2d 893 (1986).

**{¶20}** The amount of force used in self-defense, however, must be reasonable. *State v. Fox*, 36 Ohio App.3d 78, 79, 520 N.E.2d 1390 (9th Dist.1987). That is, "'one may use such force as the circumstances require in order to defend against danger that one has good reason to apprehend.'" *Id.*, quoting *State v. McLeod*, 82 Ohio App. 155, 157, 80 N.E.2d 699 (9th Dist.1948); *see also Akron v. Dokes,* 31 Ohio App.3d 24, 25, 507 N.E.2d 1158 (9th Dist.1986). Where one uses a greater degree of force than is necessary under all the circumstances, it is not justifiable on the grounds of self-defense. *See State v. Jackson*, 10th Dist. Franklin No. 00AP-444, 2000 Ohio App. LEXIS 5808 (Dec. 14,

2000), citing *McLeod*.   The issue of whether a defendant used unreasonable force in repelling a perceived danger is a question of fact for the finder of fact. *Jackson*, citing *State v. Deans*, 10th Dist. Franklin No. 98AP-1463, 1999 Ohio App. LEXIS 4602 (Sept. 30,1999).

{¶21}   After a careful consideration of the record in its entirety, we find that the manifest weight of the evidence clearly demonstrates that N.S. was not primarily at fault in creating the situation giving rise to the affray.   With regard to whether N.S. demonstrated by a preponderance of the evidence that he had a bona fide belief that he was in imminent danger of great bodily harm and that his only means of escape from such danger was the use of force, the trial court was free to believe or disbelieve all or any of the testimony presented on these remaining issues.   *State v. Montanez*, 8th Dist. Cuyahoga No. 100013, 2014-Ohio-1723, ¶ 46, citing *State v. Matthews*, 10th Dist. Franklin No. 11AP-532, 2012-Ohio-1154, and *State v. Jackson*, 10th Dist. Franklin No. 01AP-973, 2002-Ohio-1257.   Under the totality of the circumstances presented herein, we are unable to conclude that the trial court lost its way in concluding that N.S. failed to establish the remaining elements of self-defense by the requisite degree of evidence.

{¶22} With regard to whether N.S. had a bona fide belief that he was in imminent danger of great bodily harm from T.T., the record demonstrates that T.T. repeatedly threatened N.S., while N.S. repeatedly attempted to defuse the situation.   As noted by the trial court, T.T. was not simply an innocent bystander.   Nonetheless, the record does

contain evidence that N.S. ultimately agreed to fight T.T. at the gas station near school. When the actual confrontation resulted, T.T. was not armed. He grabbed and bit N.S., but the confrontation did not present the threat of great bodily harm. Moreover, by attacking T.T. with a knife, N.S. used a far greater degree of force than was necessary under the circumstances. In addition, N.S. had other means of escape besides the use of a deadly weapon, and had the ability to flee the scene at that point. Based on the foregoing, the manifest weight of the evidence demonstrates that N.S. exceeded the scope of any self-defense privilege he may have had in this matter, and also failed to retreat from the situation.

{¶23} Because the trial court was in the best position to determine the credibility of each witness by taking into account inconsistencies, as well as the manner and demeanor of the witnesses, we cannot conclude that this record presents a scenario where the trier of fact clearly lost its way in rejecting N.S.'s claim of self-defense.

{¶24} The assignment of error is overruled.

{¶25} Judgment is affirmed.

It is ordered that appellee recover of appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court, juvenile division, to carry this judgment into execution. The adjudication of delinquency having been affirmed, any bail or stay of execution pending appeal is terminated.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MARY EILEEN KILBANE, JUDGE

EILEEN A. GALLAGHER, P.J., and
TIM McCORMACK, J., CONCUR