[Cite as *State v. Kurtz*, 2018-Ohio-3942.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT


State of Ohio,                                          :

      Plaintiff-Appellee,                          :

                                       No. 17AP-382

v.                                                     :          (C.P.C. No. 15CR-3276)

Kyle Z. Kurtz,                                         :          (REGULAR CALENDAR)

      Defendant-Appellant.                         :


D E C I S I O N

Rendered on September 27, 2018


**On brief:** *Ron O'Brien*, Prosecuting Attorney, and *Kimberly M. Bond*, for appellee. **Argued:** *Kimberly M. Bond.*

**On brief:** *Todd W. Barstow*, for appellant. **Argued:** *Todd W. Barstow.*


APPEAL from the Franklin County Court of Common Pleas

SADLER, J.

{¶ 1} Defendant-appellant, Kyle Z. Kurtz, appeals from a judgment of the Franklin County Court of Common Pleas convicting him of aggravated robbery, in violation of R.C. 2911.01, kidnapping, in violation of R.C. 2905.01, aggravated murder, in violation of R.C. 2903.01, and murder, in violation of R.C. 2903.02. For the reasons that follow, we affirm.

## I. FACTS AND PROCEDURAL HISTORY

{¶ 2} In 2015, Jeanette Hampton lived at a residence on North James Road near Broad Street on the near east side of Columbus, Ohio. She lived there with her children, a 16-year old daughter, T.C., and a 12-year old son. Hampton's boyfriend was Brandon Brown, the victim in this case. There is no dispute that Hampton sold marijuana from her home and that appellant's friend, Jim Rose, had been a frequent customer for the previous

2 years.  Appellant testified that he uses marijuana on a daily basis and that he had been to Hampton's home on approximately 40 occasions to buy marijuana from Hampton prior to June 26, 2015.  Appellant estimated that he was accompanied by Rose on roughly 20 of his 40 prior drug buys from Hampton.

{¶ 3}    Hampton testified in the early evening of June 26, 2015, she received a telephone call from appellant on her home phone.  According to Hampton, appellant was angry and hostile on the phone, and he claimed that Brown owed him money.  Hampton testified that Brown took the phone from her and that he began arguing with appellant over the phone and telling appellant that he did not owe him money.  Hampton heard Brown repeating what appellant was saying to him over the phone.  She heard Brown say "you going to come over here and shoot me with what?"  (Tr. Vol. II at 105.)  Hampton heard Brown say to appellant to "come on."  (Tr. Vol. II at 106.)

{¶ 4}    Though Hampton wanted to avoid a confrontation and asked Brown to leave, he insisted on staying to "make sure that nobody else that was in the house was harmed." (Tr. Vol. II at 107.)  Hampton testified that a series of phone calls between Brown and appellant took place between 6:00 and 6:45 p.m.  Brown told Hampton he was going to wait outside for appellant with a gun because appellant was coming there to shoot him.

{¶ 5}    Hampton stated that about 15 minutes after Brown went outside, she looked out the window to her side door and she saw Brown standing right outside the door and she saw his gun laying on the hood of her vehicle just in front of the windshield wipers.  She saw appellant standing about 6 feet in front of Brown, pointing a gun at Brown and repeatedly ordering him to get down on the ground.  Hampton testified about what she saw as follows:

> [W]hen I looked out my window [Brown] was directly in front of my window.  The gun was sitting on my front of my car on this (indicating) side of him.  The gun was basically in the back of him so he wasn't even in front of the gun, I mean, where he could reach it.

(Tr. Vol. II at 123.)

{¶ 6}    When Hampton went to get her phone to call police, she heard gunshots. When she looked out the window again, she saw Brown on his knees with his arms out and appellant walking back to his vehicle which was parked in the driveway.  As Hampton started to go out the door to help Brown, she stopped when she saw appellant come back to

retrieve his car keys he had left on top of the recycling bin near the side door to the house. When she next looked out, she noticed that Brown's gun was no longer on the hood of her vehicle.

{¶ 7} Hampton's daughter, T.C., testified that she ran to her upstairs bedroom window when she heard Brown and appellant yelling at each other outside. She first saw Brown and appellant pointing guns at one another. When appellant told Brown to get on the ground, T.C. heard Brown say "no," but she also saw Brown place his gun down on the hood of the vehicle and then put his hands up. T.C. heard Brown utter words to the effect of "you really going to shoot me?" (Tr. Vol. II at 224.) For the next one and one-half minutes, appellant continued to yell at Brown and then T.C. watched as appellant shot Brown in the face. As Brown staggered back out of her view, T.C. saw appellant continue to shoot in his direction. T.C. then saw appellant take Brown's gun from the hood of the vehicle and walk back to his vehicle. She also saw him return to get his keys off the recycle bin.

{¶ 8} One of Hampton's neighbors heard the gunshots and saw appellant drive away. She got the license plate and called police. Other neighbors testified that they saw appellant walking away from the scene and then briefly returning before getting in his vehicle and driving away. Whitehall police officer Kendall Tiega arrived at the scene about ten minutes after the shooting while Brown was still alive. According to Tiega, Brown was able to tell her that a man named Kyle had shot him.

{¶ 9} Appellant's vehicle was spotted shortly thereafter by another Whitehall police officer, and when appellant stopped at a tobacco store, he was taken into custody without incident. Two handguns were recovered from appellant's vehicle: a 9mm semi-automatic pistol with a 15-round magazine that was fully loaded and operable but had not been fired, and appellant's 9mm semi-automatic pistol with a 14-round magazine that contained 2 rounds. Ten shell casings matching appellant's pistol were recovered from the scene.

{¶ 10} The evidence shows that Brown was shot ten times, once through the front of his eye, twice through his forearm, and seven more times in his back. The coroner's report lists "[m]ultiple gunshot wounds" as the cause of death. (State's Ex. E, Coroner's Report at 2.)

{¶ 11} On July 6, 2015, a Franklin County Grand Jury indicted appellant on charges of aggravated robbery, in violation of R.C. 2911.01, a felony of the first degree; kidnapping, in violation of R.C. 2905.01, a felony of the first degree; two counts of aggravated murder, in violation of R.C. 2903.01, an unspecified felony; two counts of murder, in violation of R.C. 2903.02, an unspecified felony; and tampering with evidence, in violation of R.C. 2921.12, a felony of the third degree.  With the exception of the tampering with evidence charge, each of the charges in the indictment was accompanied by a firearm specification.

{¶ 12} Appellant did not deny shooting and killing Brown, but he claimed that he did so in self-defense.  A jury found appellant guilty of all charges and specifications with the exception of the count and specification for aggravated murder with prior calculation and design and tampering with evidence.

{¶ 13} The trial court convicted appellant and sentenced him to a prison term of 20 years to life, plus an aggregate consecutive prison term of 6 years for the firearm specifications.[1]  Appellant timely appealed to this court from the judgment of conviction and sentence.

## II.  ASSIGNMENT OF ERROR

{¶ 14} Appellant assigns the following as trial court error:

> THE TRIAL COURT ERRED AND DEPRIVED APPELLANT OF DUE PROCESS OF LAW AS GUARANTEED BY THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND ARTICLE ONE SECTION TEN OF THE OHIO CONSTITUTION BY FINDING HIM GUILTY OF AGGRAVATED MURDER; MURDER; KIDNAPPING; AND AGGRAVATED ROBBERY AS THOSE VERDICTS WERE NOT SUPPORTED BY SUFFICIENT EVIDENCE AND WERE ALSO AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

## III. STANDARD OF REVIEW

{¶ 15} Sufficiency of the evidence is a legal standard that tests whether the evidence is legally adequate to support a verdict.  *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997).  Whether the evidence is legally sufficient to support a verdict is a question of law, not fact.  *Id.*  In determining whether the evidence is legally sufficient to support a conviction, " '[t]he

---

[1] The trial court merged the counts in the indictment charging appellant with murder for purposes of conviction and sentence.  (Jan. 22, 2018 Sentencing Hearing Tr. at 36.)

relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.' " *State v. Robinson*, 124 Ohio St.3d 76, 2009-Ohio-5937, ¶ 34, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. "A verdict will not be disturbed unless, after viewing the evidence in a light most favorable to the prosecution, it is apparent that reasonable minds could not reach the conclusion reached by the trier of fact." *State v. Patterson*, 10th Dist. No. 15AP-1117, 2016-Ohio-7130, ¶ 32, citing *State v. Treesh*, 90 Ohio St.3d 460, 484 (2001).

{¶ 16} In a sufficiency of the evidence inquiry, appellate courts do not assess whether the prosecution's evidence is to be believed but whether, if believed, the evidence supports the conviction. *State v. Yarbrough*, 95 Ohio St.3d 227, 2002-Ohio-2126, ¶ 79-80 (evaluation of witness credibility not proper on review for sufficiency of evidence); *State v. Bankston*, 10th Dist. No. 08AP-668, 2009-Ohio-754, ¶ 4 (noting that "in a sufficiency of the evidence review, an appellate court does not engage in a determination of witness credibility; rather, it essentially assumes the state's witnesses testified truthfully and determines if that testimony satisfies each element of the crime"). "Further, 'the testimony of one witness, if believed by the jury, is enough to support a conviction.' " *Patterson* at ¶ 33, quoting *State v. Strong*, 10th Dist. No. 09AP-874, 2011-Ohio-1024, ¶ 42. *See also State v. Clark*, 10th Dist. No. 15AP-926, 2016-Ohio-5493, ¶ 25.

{¶ 17} "When presented with a manifest-weight challenge, an appellate court may not merely substitute its view for that of the trier of fact but must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Patterson* at ¶ 34, citing *Thompkins* at 387, citing *State v. Martin,* 20 Ohio App.3d 172, 175 (1st Dist.1983). An appellate court should reserve reversal of a conviction as being against the manifest weight of the evidence for only the most " 'exceptional case in which the evidence weighs heavily against the conviction.' " *Thompkins* at 387, quoting *Martin* at 175.

{¶ 18} In conducting a manifest weight of the evidence review, we may consider the credibility of the witnesses. *State v. Cattledge*, 10th Dist. No. 10AP-105, 2010-Ohio-4953,

¶ 6. However, in conducting such review, "we are guided by the presumption that the jury, or the trial court in a bench trial, 'is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony.' " *Id.*, quoting *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984). "Accordingly, we afford great deference to the jury's determination of witness credibility." *State v. Albert*, 10th Dist. No 14AP-30, 2015-Ohio-249, ¶ 14. "Mere disagreement over the credibility of witnesses is not a sufficient reason to reverse a judgment on manifest weight grounds." *State v. Harris*, 10th Dist. No. 13AP-770, 2014-Ohio-2501, ¶ 25, *appeal not allowed*, 140 Ohio St.3d 1455, 2014-Ohio-4414, citing *State v. G.G.*, 10th Dist. No. 12AP-188, 2012-Ohio-5902, ¶ 7.

## IV. LEGAL ANALYSIS

### A. Appellant's Assignment of Error

{¶ 19} In appellant's sole assignment of error, appellant contends his convictions are not supported by sufficient evidence and are against the manifest weight of the evidence. We disagree.

{¶ 20} The most serious offense of which appellant was convicted is the offense of aggravated murder, which is defined in R.C. 2903.01(B), in relevant part, as follows:

> (B) No person shall purposely cause the death of another * * * while committing or attempting to commit, or while fleeing immediately after committing or attempting to commit, kidnapping * * * [or] robbery.[2]

{¶ 21} In making his argument in support of his assignment of error, appellant essentially concedes that the testimony of the witnesses called by plaintiff-appellee, State of Ohio, if believed, is sufficient to sustain his convictions beyond a reasonable doubt. Appellant does not argue that appellee failed to produce evidence to establish all the essential elements of the offenses for which he was convicted. He admits that he held Brown at gunpoint, that he shot and killed Brown, and that he left the scene with Brown's pistol. Rather, appellant argues that his own testimony in support of his claim of self-defense is more believable than the testimony of appellee's witnesses. As such, we must

---

[2] Appellant was acquitted of the charge of aggravated murder as defined in R.C. 2903.01(A), which provides, in relevant part, that "[n]o person shall purposely, and *with prior calculation and design*, cause the death of another." (Emphasis added.)

review appellant's argument under the manifest weight of the evidence standard, rather than the sufficiency of the evidence standard.  *See State v. Johnson*, 10th Dist. No. 06AP-878, 2007-Ohio-2792, ¶ 31, quoting *State v. Cooper*, 170 Ohio App.3d 418, 2007-Ohio-1186, ¶ 15 (4th Dist.) (" 'Once the state has satisfied the question of legal adequacy * * *, the question of relative persuasiveness' of a self-defense affirmative defense 'must await * * * appellate scrutiny under a manifest weight of the evidence analysis.' "); *State v. Montanez*, 8th Dist. No. 100013, 2014-Ohio-1723, ¶ 41, fn. 5, quoting *State v. Wilson*, 8th Dist. No. 97350, 2012-Ohio-1952, ¶ 39, citing *State v. Dykas*, 185 Ohio App.3d 763, 2010-Ohio-359, ¶ 18 (8th Dist.) (" '[W]hen reviewing a claim by a defendant that evidence supports his claim of self-defense, the manifest-weight standard is the proper standard of review because a defendant claiming self-defense does not seek to negate an element of the offense charged but rather seeks to relieve himself from culpability.' ").

{¶ 22} Self-defense is an affirmative defense that the accused has the burden to prove by a preponderance of the evidence.  *State v. M.L.D.*, 10th Dist. No. 15AP-614, 2016-Ohio-1238, ¶ 40, citing R.C. 2901.05(A).  Pursuant to the decision of the Supreme Court of Ohio in *State v. Robbins*, 58 Ohio St.2d 74 (1979), to establish self-defense defense through the use of deadly force, defendant must prove by a preponderance of the evidence (1) he was not at fault in creating the situation giving rise to the affray, (2) he had a bona fide belief he was in imminent danger of death or great bodily harm and his only means of escaping such danger was to use such force, and (3) he must not have violated any duty to retreat or avoid the danger.  *State v. Kendricks*, 10th Dist. No. 10AP-114, 2010-Ohio-6041, ¶ 34, citing *Robbins* at paragraph two of the syllabus; R.C. 2901.05(A).  *See also State v. Smith*, 10th Dist. No. 04AP-189, 2004-Ohio-6608, ¶ 16.  A person may use only as much force as is reasonably necessary to repel an attacker.  *State v. Harrison*, 10th Dist. No. 06AP-827, 2007-Ohio-2872, ¶ 25, citing *State v. Jackson*, 22 Ohio St.3d 281 (1986).  "Because the elements of self-defense are cumulative, '[i]f the defendant fails to prove *any one* of these elements * * * he has failed to demonstrate that he acted in self-defense.' "  (Emphasis sic.) *Kendricks* at ¶ 34, quoting *Jackson* at 284.

{¶ 23} Appellant testified that he had purchased marijuana from Hampton on 40 or 50 occasions prior to June 26, 2015.  Appellant stated that about one-half of those purchases were made in the company of his friend, Jim Rose, and the other one-half he

made by himself. According to appellant, on one occasion when he went to Hampton's house to purchase marijuana, he was met by Brown, who introduced himself as "B." (Tr. Vol. IV at 575.) According to appellant, Brown told him to wait in the car while he went across the street to a bar or a store and then went back into Hampton's house. When Brown returned with the marijuana, he told appellant that he had recently been released from "the joint," which appellant understood to mean prison, and that he had "whopped or beat up a couple of guys." (Tr. Vol. IV at 595.) Appellant testified this incident occurred on or about June 9, 2015. Appellant did not consider this statement by Brown as threatening but as a word of caution to him or anyone else who might consider stealing from Hampton.

{¶ 24} Appellant testified that on June 26, 2015, he telephoned Hampton looking to buy one-quarter ounce of marijuana plus two additional grams at a total price of $40. Appellant told Hampton that Brown had shorted him one gram on his previous purchase and asked her to make up the difference on this transaction. According to appellant, Hampton put Brown on the phone, and he denied shorting appellant. When appellant threatened to call the police on Brown, Brown told him not to do that and that he would call back.

{¶ 25} According to appellant, he received a call shortly thereafter from an unidentified number but that no one responded when he picked up. Believing the call was from Brown, he called Hampton's number and Brown picked up. Appellant told Brown he wanted to buy one-quarter ounce plus two extra grams for $40, plus the additional gram that Brown had shorted him. Appellant believed Brown was angry that appellant had earlier mentioned the police, but he told appellant to come over.

{¶ 26} Appellant testified that he pulled into Hampton's driveway a few feet in from the curb. There was a vehicle parked further up the driveway near the side entrance to the home. Appellant got out of his vehicle with his money and his 9mm pistol in the right front pocket of his cargo shorts. As appellant approached the side entrance to the home, he saw Hampton peering out the window at him. Appellant then saw Brown come around the back of the house with his right arm hidden behind his back. Brown was wearing a hoodie with the hood up and a black baseball cap. As Brown approached appellant, he raised his right arm and pointed a handgun in appellant's face. At that point, appellant was standing

between a recycle bin next to the house on his right and the passenger side of the vehicle to his left.  Brown was facing him a few feet away next to the vehicle's passenger side tire.

{¶ 27}  Appellant testified that he raised his arms in the air with his car keys in his right hand.  Brown asked appellant "where's the money you're supposed to be bringing over?"  (Tr. Vol. IV at 619.)  Appellant then placed his keys on the recycle bin and reached into his right pocket and drew his gun on Brown.  According to appellant, he told Brown to put his gun down.  When appellant repeated his demand, Brown placed his handgun on the hood of the vehicle near the passenger side windshield wiper.  Appellant claims that he still feared for his life, and he just wanted to leave.  Appellant did not believe it would be safe for him to leave while Brown was still able to reach his gun so he repeatedly told Brown to get on the ground but Brown refused.  Appellant explained what happened next as follows:

> Q.  Okay.  So what happened next?
>
> A.  Then I repeated myself, I still felt in danger.  And I repeated it, I still had him at gunpoint and I said, get on the ground I wanted to leave.
>
> Q.  Okay
>
> A.  And he said, ain't nobody playing with you and went to grab the gun.  And when he did that, I opened fire.

(Tr. Vol. IV at 624.)

{¶ 28}  According to appellant, after he opened fire, Brown turned to his right and began reaching under his hoodie with his left arm toward his waistband as he ran toward the back of the house.  Appellant pursued Brown and fired numerous shots into Brown's back until he fell.  Appellant then grabbed Brown's gun and walked at a fast pace towards his vehicle and got in.  On realizing he left his car keys on the recycle bin, he got out of his vehicle, retrieved his keys, and jumped back into his vehicle.  Appellant testified it took five minutes for him to back out of the driveway because of the traffic.  Appellant drove down James Road to Broadway, through an alley and stopped at a tobacco store where he intended to pick up tobacco and rolling papers for his mother.  Appellant was stopped by a police cruiser in front of the store and arrested.

{¶ 29}  Appellant presented his father's testimony in support of his claim that he was not angry when he spoke with Brown on the telephone on June 26, 2015.  Steven Kurtz

testified he was at home on the afternoon of June 26, 2015, when appellant received a telephone call on his cell phone at around 6:30 p.m. Appellant lived at his parent's home. Kurtz stated that he did not hear any anger in appellant's voice as he spoke and that appellant did not appear to be angry when he left the residence.

{¶ 30} Appellant's theory, based on his own testimony and the testimony of his father, was that he was simply going to Hampton's house to buy more marijuana as he had done many times in the past and that Brown seized an opportunity to rob appellant at gunpoint and steal the $40 he told Brown that he would be bringing with him. In support of his theory, appellant claimed that the dispute over the prior marijuana purchase was not serious and that he had not been angry with Brown. Appellant maintained he did not arm himself before he went to Hampton's house with the intent to shoot Brown. He insisted that he carried his pistol in his pants pocket or jacket pocket any time he left his vehicle. According to appellant, he feared for his life when he was confronted by Brown at gunpoint, a man who he knew had been recently released from prison and who had admitted hurting other inmates. Though appellant acknowledged that Brown did place his weapon on the hood of the vehicle when appellant drew his own weapon, he testified that he did not feel he could safely flee until Brown was on the ground. When Brown refused to get on the ground and lunged forward to retrieve his weapon, appellant felt he had no choice other than to fire his weapon at Brown and continue firing at him until he went down.

{¶ 31} "A defendant is not entitled to a reversal on manifest weight grounds merely because inconsistent evidence was offered at trial." *State v. Favor*, 10th Dist. No. 08AP-215, 2008-Ohio-5371, ¶ 10, citing *State v. Campbell*, 10th Dist. No. 07AP-1001, 2008-Ohio-4831. "Neither is a conviction against the manifest weight of the evidence because the trier of fact believed the state's version of events over the defendant's version." *State v. Rankin*, 10th Dist. No. 10AP-1118, 2011-Ohio-5131, ¶ 29, citing *State v. Gale*, 10th Dist. No. 05AP-708, 2006-Ohio-1523, ¶ 19; *State v. Williams*, 10th Dist. No. 08AP-719, 2009-Ohio-3237, ¶ 17. The trier of fact is free to believe or disbelieve any or all of the testimony presented. *State v. Jackson*, 10th Dist. No. 06AP-1267, 2008-Ohio-1277, ¶ 11. The trier of fact is in the best position to take into account the inconsistencies in the evidence, as well as the demeanor and manner of the witnesses, and to determine which witnesses are more credible. *State v. Williams*, 10th Dist. No. 02AP-35, 2002-Ohio-4503, ¶ 58. Though

appellate courts must sit as a "thirteenth juror" when considering a manifest weight argument, it must also give great deference to the trier of fact's determination on the credibility of the witnesses. *Favor* at ¶ 10, citing *State v. Covington*, 10th Dist. No. 02AP-245, 2002-Ohio-7037.

{¶ 32} After reviewing the entire record, weighing the evidence and all reasonable inferences, and considering the credibility of witnesses, we find that the jury did not clearly lose its way and create such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The pertinent conflicts between the testimony of appellee's witnesses and the testimony of appellant was whether appellant was at fault for giving rise to the confrontation with Brown and whether it was reasonable for appellant to believe that he was in imminent danger of death or great bodily harm once Brown had put his gun down.

{¶ 33} Hampton testified that appellant and Brown had an angry confrontation over the telephone and that Brown told her appellant was coming over to shoot him. Fifteen minutes later, appellant arrived at Hampton's home carrying a 9mm pistol in his pants pocket and walked up to the side door of Hampton's home where the confrontation took place. T.C. testified that she saw Brown put his gun on the hood of the vehicle and raise his hands up moments before appellant shot him in the face. According to T.C., Brown did not reach for his pistol after putting it down. Hampton testified that Brown's pistol was behind him on the hood of the vehicle and out of Brown's reach just before she heard the shots. The physical evidence showed that Brown was shot ten times with seven of those shots entering his back. Appellant admitted that he continued to follow Brown and fire shots at him as Brown had turned away and ran toward the back of the house. Under similar circumstances, this court has upheld convictions where the appellant had argued on appeal that the jury lost its way in rejecting a claim of self-defense. *See, e.g., State v. Monroe*, 10th Dist. No. 99AP-1464 (Sept. 21, 2000) (appellant's murder conviction was not against the manifest weight of the evidence where the jury heard conflicting evidence as to the critical issue whether the victim had a gun or shot at appellant before appellant shot the victim); *State v. Roland*, 10th Dist. No. 16AP-484, 2017-Ohio-557, ¶ 21-23 ("[A]ppellant's own version of the incident refuted any legitimate claim that he acted in self-defense [where] [a]ppellant stated that [the victim] had turned to walk or run away when he fired his gun.

[The victim] was shot in the back," and appellant "admitted firing multiple shots at the victim."); *Rankin* at ¶ 26 (The jury did not lose its way by finding that defendant did not act in self-defense, pursuant to R.C. 2901.05(A), because, when the victim was shot, both of his hands were in his pockets. Also, no DNA from the victim was on the gun, and passersby observed a peaceful scene immediately before shots were fired.).

{¶ 34} We note that some of the conflicting evidence admitted in the case may have provided the jury with a reasonable basis to question appellant's credibility. For example, appellant acknowledged that Rose was with him when Brown allegedly made the statement about being in prison. Rose had worked with appellant at appellant's father's pizza shop, and the two men were friends. Rose testified, in rebuttal, that he did not remember Brown making any such statement on that date or at any other time. Rose also recalled that this interaction with Brown occurred on Wednesday, June 24, 2015, just two days before appellant fatally shot Brown, not two weeks earlier as appellant had stated. Rose testified that appellant bought one-quarter ounce of marijuana on June 24, 2015, and he was positive that it was June 24, 2015 because his birthday was two days later, June 26, 2015. Given appellant's testimony about the size and frequency of his marijuana purchases from Hampton, appellant would not have needed to purchase more marijuana just two days after buying one-quarter ounce, even if Brown had shorted him a gram.[3]

{¶ 35} Additionally, though appellant testified that he always carried his pistol in his pants pocket, with the handle sticking out, or in his jacket pocket with the handle sticking out, Rose testified that he never saw appellant carrying his pistol in this manner. Rose testified that appellant typically kept the pistol in the glove box or under his driver's seat and that he had seen appellant place the gun on his lap and lock the car doors as he waited for Rose to return from Hampton's house with the marijuana. Appellant also testified that he only spoke with Brown on the telephone two times on June 26, 2015, but the prosecutor confronted appellant with telephone records during appellant's cross-examination showing that four calls had been exchanged between appellant's and Hampton's phone numbers during the 45-minute period leading up to the fatal shooting. Finally, appellant admitted on cross-examination that he never told police that Brown had lured him over to Hampton's

---

[3] Appellant testified "I would smoke maybe a gram a day, so a quarter would last me a week." (Tr. Vol. IV at 579.)

house in order to rob him. Appellant admitted that the first time he publicly told this story was in his direct examination at trial.

{¶ 36} In resolving the conflicting witness testimony, the jury obviously chose to believe appellee's witnesses and to disbelieve appellant with regard to the critical factual issues in dispute. This being the case, it was reasonable for the jury to conclude that appellant failed to prove either that he was not at fault in creating the situation giving rise to the affray, that he had a bona fide belief he was in imminent danger of death or great bodily harm and his only means of escaping such danger was to use such force, or that he had not violated any duty to retreat or avoid the danger. *Kendricks* at ¶ 34, citing *Robbins* at paragraph two of the syllabus; R.C. 2901.05(A). Because these elements of a self-defense claim are cumulative, appellant's failure to prove any of the elements by a preponderance of the evidence foreclosed a jury finding that appellant shot and killed Brown in self-defense. *Robbins*; *Kendricks*; R.C. 2901.05(A).

{¶ 37} For the foregoing reasons, we hold that appellant's convictions were supported by sufficient evidence in the record and were not against the manifest weight of the evidence. Accordingly, we overrule appellant's sole assignment of error.

## V. CONCLUSION

{¶ 38} Having overruled appellant's sole assignment of error, we affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

BROWN, P.J., and DORRIAN, J., concur.

_____