[Cite as *State v. Wood*, 2020-Ohio-4895.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

State of Ohio,                                     :

      Plaintiff-Appellee,             :

                                          No. 19AP-649

v.                                                :       (C.P.C. No. 18CR-2744)

Darius M. Wood,                                   :       (REGULAR CALENDAR)

      Defendant-Appellant.            :

---

D E C I S I O N

Rendered on October 13, 2020

---

**On brief:** *Ron O'Brien*, Prosecuting Attorney, and *Daniel J. Stanley*, for appellee.

**On brief:** *Wolfe Law Group, LLC*, and *Stephen T. Wolfe*, for appellant.

---

APPEAL from the Franklin County Court of Common Pleas

KLATT, J.

{¶ 1} Defendant-appellant, Darius M. Wood, appeals from a judgment entry of the Franklin County Court of Common Pleas finding him guilty, pursuant to jury verdict, of two counts of felonious assault, one count of discharge of a firearm on or near prohibited premises, and one count of carrying a concealed weapon. We affirm appellant's convictions but vacate his sentence and remand for resentencing.

{¶ 2} By indictment filed June 7, 2018, plaintiff-appellee, State of Ohio, charged appellant with two counts of felonious assault in violation of R.C. 2903.11, both second-degree felonies; one count of discharge of a firearm on or near prohibited premises in

violation of R.C. 2923.162, a third-degree felony; one count of improperly handling firearms in a motor vehicle in violation of R.C. 2923.16, a fourth-degree felony, and one count of carrying a concealed weapon in violation of R.C. 2923.12, a fourth-degree felony. The felonious assault and discharge of a firearm on or near prohibited premises counts all carried three-year firearm specifications in violation of R.C. 2941.145(A).

{¶ 3} The charges arose from an incident occurring on May 29, 2018. Early that evening, 19-year-old Joshua Fouty drove his girlfriend, Makayla Emrick, and three other friends, Lawrence Chester, Adam Millis, and Trey Profit, to buy marijuana. Fouty knew that the money to be used in the drug transaction was counterfeit, but he did not know with whom the transaction was to occur. Chester, who had arranged the drug transaction, directed Fouty to a location in the Hilltop area of Columbus. Fouty parked his car on a side street; appellant and another man approached the car on foot. Fouty recognized appellant because the two had attended the same high school and knew each other through various activities and mutual acquaintances. He did not know the other man.

{¶ 4} Chester gave appellant the counterfeit money in exchange for a bag of marijuana. Fearing that appellant would soon discover the money was counterfeit, Fouty sped away from the area. Through his rearview mirror, he saw appellant running after the car. Although Fouty did not actually see appellant holding a gun, he deduced that appellant was carrying one based on the way he was running and the position of his hand on his body.

{¶ 5} Fouty drove to his house on Drumlin Drive in Grove City, where he lived with his family and Emrick. Fouty, Emrick, and Millis went inside the house to smoke the marijuana obtained from appellant; Chester and Profit left.

{¶ 6} At approximately 10:00 p.m. that evening, Fouty, Emrick, and Fouty's sister, Amanda Martin, went outside to smoke marijuana in Martin's car, which was parked in the driveway. Martin, Emrick, and Fouty sat in the driver's seat, front passenger seat, and backseat, respectively. At this point, Fouty had not informed Martin of the earlier drug transaction involving appellant.

{¶ 7} Shortly thereafter, Fouty noticed a vehicle pass his house and park in front of a neighbor's house. Appellant exited the passenger side of the vehicle and walked up the driveway toward the Fouty's front door. Appellant yelled and knocked on Martin's car window. At trial, Fouty described appellant as a "linky, tall" guy with short hair. (Tr. at

177.) He further testified that he was certain that it was appellant who knocked on the car window, averring that he was "willing to bet every single paycheck that I have, promise you. I put it on God." *Id.* at 181. Although Fouty did not see a gun on appellant's person, he could tell by the way appellant was holding his hand near his waist when he knocked on the window that he had a gun.

{¶ 8} Martin did not know the identity of the man who knocked on her car window; she noted, however, that he was tall and skinny, with short hair. Fouty and Emrick directed Martin to back out of the driveway and drive away. Fouty ducked down in the back seat; he heard several gunshots coming from behind Martin's car as she drove down the street. Martin looked in her rearview mirror and saw the man who had knocked on her car window standing in the street, approximately five to seven feet behind her car. The man pulled a gun out of the waistband of his pants and fired several shots at her car. She got a "good look" at the man's face in her rearview mirror. *Id.* at 262. She did not see anyone else in the area where the shots were fired. At least two bullets struck the rear bumper and trunk of Martin's car; one bullet penetrated the trunk. In addition, at least one bullet struck Fouty's car, which was parked on the street.

{¶ 9} Fearing that appellant would follow them, Fouty directed Martin to continue driving. Fouty then called his parents and the police. Martin eventually drove to the home of one of her friends. While there, Fouty and Emrick told Martin about their earlier encounter with appellant. They searched Facebook for a picture of appellant to show Martin. Martin testified that without influence from either Fouty or Emrick, she concluded that the person in the Facebook photo was the person who had fired the shots at her car. *Id.* at 280-81.

{¶ 10} Columbus Police Officer Gerald Tulga was dispatched to the scene. Upon arrival, he noted that the area was a residential neighborhood illuminated by streetlights. Several residents were standing in and along the street. Pursuant to interviews with the residents, Officer Tulga learned that a person had exited a vehicle in the street and fired several shots from a handgun at Martin's car as it drove away.

{¶ 11} One of the neighbors, Jennifer Magaw, lived two doors down from the Fouty home. She testified that at approximately 10:00 p.m., she was standing in her garage and saw a man fire 12 shots at cars parked in front of the Fouty house. Because the man was

illuminated by the streetlights, Magaw could see that he was Caucasian, approximately 6 feet tall, with a thin build and very short hair. Magaw was concerned for her son's safety, as moments before the shooting began, he and his girlfriend walked from Magaw's house to his car parked across the street.

{¶ 12} Fouty, Martin, and Emrick eventually returned to the scene. By this time, other police officers had arrived. Emrick did not want to talk to the police because she was on probation related to a prior criminal proceeding; accordingly, she went directly into the house. Fouty's brother, who also knew appellant from high school, showed the officers pictures of appellant he had found on Facebook.

{¶ 13} Officer Tulga examined Martin's car and observed that the rear bumper and trunk had sustained damage consistent with bullet strikes. He also noted that Fouty's car, which was parked along the street, had been damaged by gunfire. Officer Tulga collected 12 spent 9mm shell casings and one 9mm bullet fragment from the scene.

{¶ 14} Fouty told the police about the shooting incident; however, he averred that he did not want to press charges against appellant for fear of further retaliation from him. He also did not divulge Emrick's presence in the house due to her probationary status. Martin also recounted the incident to the police but did not tell them that she had been smoking marijuana or that Emrick was a passenger in the car.

{¶ 15} Detective Charles Rosch presented separate photo arrays to Fouty and Martin at the scene. Each included appellant's photo along with photos of five similar-looking men. Fouty identified appellant as the shooter with "100 percent" certainty; however, he indicated on the accompanying procedure form that he did not want to cooperate with the investigation; he also refused to sign the form. (State's Ex. A-1, A-2; Tr. at 196-97, 199.) Fouty also identified appellant in court as the shooter.

{¶ 16} Martin noted on both the photo array and the accompanying photo array procedure form that she was "75 percent sure" appellant was the shooter. (State's Ex. A-3, A-4; Tr. at 274, 276-77.) At trial, she explained that at the time she made the identification, she was not one hundred percent sure because appellant was smiling in the Facebook photo she had seen earlier but was not smiling in the photo array picture. She also testified that she got "a good look" at appellant and was "absolutely" confident that she saw a gun in appellant's hand and then saw him fire that gun. *Id* at 262. She further testified that she

was "absolutely positive" that the person in the Facebook photo was the person who fired the shots at her car. *Id.* at 275-76. She also identified appellant in court as the shooter and averred she was "absolutely positive" of her identification. *Id.* at 276.

{¶ 17} Appellant elected not to testify at trial or otherwise present a defense. At the conclusion of trial, the jury returned verdicts finding appellant not guilty of improperly handling firearms in a motor vehicle, but guilty of the felonious assault of Fouty and Martin with the accompanying firearm specifications, discharge of a firearm on or near prohibited premises with the accompanying firearm specification, and carrying a concealed weapon.

{¶ 18} Following a sentencing hearing, the trial court imposed a 2-year sentence on each of the felonious assault counts, plus an additional mandatory 3-year sentence on each of the firearm specifications attached to those counts. In addition, the court imposed a 12-month sentence on the discharge of a firearm on or near prohibited premises count, plus an additional mandatory 3-year sentence on the firearm specification attached to that count. Finally, the court imposed a 12-month sentence on the carrying a concealed weapon count. The court ordered the sentences on the felonious assault, discharge of a firearm on or near prohibited premises, and carrying a concealed weapon counts to be served concurrently with each other and consecutively to the 3 attendant firearm specifications. The court further ordered the 3 firearm specifications to run consecutively to each other. In sum, the trial court imposed an aggregate prison sentence of 11 years. The court memorialized appellant's convictions and sentence in a September 11, 2019 judgment entry.

{¶ 19} In a timely appeal, appellant raises the following two assignments of error for our review:

> [I]. The jury's verdicts were against the manifest weight of the evidence.
>
> [II]. The trial court erred when it imposed a three-year gun specification on count three.

{¶ 20} Under his first assignment of error, appellant argues that his convictions were against the manifest weight of the evidence. Appellant does not challenge the legal sufficiency of the evidence.

{¶ 21} "To evaluate a claim that a jury verdict is against the manifest weight of the evidence, we review the entire record, weigh the evidence and all reasonable inferences,

consider the credibility of the witnesses, and determine whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that we must reverse the conviction and order a new trial." *State v. Wilks*, 154 Ohio St.3d 359, 2018-Ohio-1562, ¶ 168, citing *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997). "Though appellate courts must sit as a 'thirteenth juror' when considering a manifest weight argument, [courts] must also give great deference to the trier of fact's determination on the credibility of the witnesses." *State v. Kurtz*, 10th Dist. No. 17AP-382, 2018-Ohio-3942, ¶ 31, citing *State v. Favor*, 10th Dist. No. 08AP-215, 2008-Ohio-5371, ¶ 10. A reviewing court is "guided by the presumption that the jury * * * 'is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use those observations in weighing the credibility of the proffered testimony.' " *Id.* at ¶ 18, quoting *State v. Cattledge*, 10th Dist. No. 10AP-105, 2010-Ohio-4953, ¶ 6, quoting *Seasons Coal Co., Inc. v. Cleveland,* 10 Ohio St.3d 77, 80 (1984). "Mere disagreement over the credibility of witnesses is not a sufficient reason to reverse a judgment on manifest weight grounds." *State v. Harris*, 10th Dist. No. 13AP-770, 2014-Ohio-2501, ¶ 25, citing *State v. G.G.*, 10th Dist. No. 12AP-188, 2012-Ohio-5902, ¶ 7. Reversal on manifest weight grounds is appropriate " 'only in the exceptional case in which the evidence weighs heavily against the conviction.' " *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983).

{¶ 22} Appellant was convicted of felonious assault, discharge of a firearm on or near prohibited premises, and carrying a concealed weapon. As relevant here, R.C. 2903.11(A)(2) proscribes felonious assault and states: "No person shall knowingly * * * [c]ause or attempt to cause physical harm to another * * * by means of a deadly weapon." R.C. 2923.162(A)(3) prohibits discharge of a firearm on or near prohibited premises and provides: "No person shall * * * [d]ischarge a firearm upon or over a public road or highway." R.C. 2923.12(A)(2) prohibits carrying a concealed weapon and states: "No person shall knowingly carry or have, concealed on the person's person or concealed ready at hand, * * * [a] handgun other than a dangerous ordnance."

{¶ 23} Appellant first contends his convictions were against the manifest weight of the evidence because the testimony provided by Fouty and Martin identifying him as the shooter lacked credibility. As to Fouty, appellant points to his admitted involvement in the robbery of appellant earlier in the day, his admission that he did not actually see appellant

holding a gun prior to the shooting, and his failure to inform the police of Emrick's presence in Martin's car.

{¶ 24} As noted above, issues of witness credibility are primarily for the trier of fact, and an appellate court must afford great deference to those credibility determinations. *Kurtz*, 2018-Ohio-3942, at ¶ 31. Here, the jury was at liberty to conclude that Fouty's candid admission to his involvement in robbing appellant during the course of a drug deal actually enhanced his credibility because in so testifying, he risked alienating the jury by his admitted drug use and associated criminal conduct. Further, Fouty's admission that he participated in the robbery reasonably provided the jury with an explanation for appellant's retaliatory action. Indeed, Fouty testified that he initially did not identify appellant as the shooter because he feared further retaliation from appellant.

{¶ 25} The jury was also entitled to conclude that Fouty's acknowledgement that he did not actually see appellant holding a gun prior to the shooting heightened his credibility. Fouty easily could have testified that he saw a gun in appellant's hand when appellant knocked on Martin's car window. Instead, he averred only that he could tell appellant was holding a gun by the way he held his hand near his waist when he knocked on the window.

{¶ 26} Finally, the jury could have accepted as reasonable and credible Fouty's explanation that he did not inform the police of Emrick's presence in Martin's car because she was on probation resulting from a prior criminal proceeding.

{¶ 27} We note Fouty's testimony that he knew appellant from high school. The jury could have found Fouty's identification of appellant to be reliable, given that Fouty, at age 19, very recently had been in high school with appellant. In addition, Fouty unequivocally identified appellant as the shooter both when presented with the photo array and later at trial. We further note that Fouty was subjected to vigorous cross-examination by defense counsel on all aspects of his testimony, which included questioning aimed at challenging his credibility regarding the issues raised by appellant in this appeal. The jury observed Fouty as he testified on direct and cross-examination, including his demeanor, gestures, and voice inflections, and was able to use those observations in assessing and weighing the credibility of his testimony.

{¶ 28} Appellant challenges Martin's testimony on grounds that her identification of appellant as the shooter was inconsistent and thus fatally flawed. Citing Martin's

admission that she had never seen appellant before the night of the incident, appellant argues that "despite her initial testimony that she saw [appellant] shooting, she later recanted and admitted that she had no idea of the shooter's identity." (Appellant's Brief at 6.) Appellant concludes that "[i]n reality, Martin's identification was based solely upon Fouty telling her that [appellant] was the shooter." *Id.* Appellant also challenges Martin's credibility based on her failure to inform the police of Emrick's presence in her car.

{¶ 29} Appellant mischaracterizes Martin's testimony. Martin testified on direct examination that at the time the man knocked on her car window, she did not know who he was. She further testified, however, that as she drove away from the house, she saw, through her rearview mirror, that same man standing in the street, approximately five to seven feet behind her car. At that point, she got a "good look" at the man's face. (Tr. at 262.) The man pulled a gun out of the waistband of his pants and fired several shots at her car. She did not know the man's identity until Fouty and Emrick showed her his picture on Facebook. When asked whether Fouty and/or Emrick attempted to "influence you in any way to try to get you to say this is one person when you didn't feel that way?", Martin responded "[n]o, not at all." *Id.* at 281. On cross-examination, Martin testified that she did not see the man's face when he knocked on her window; she could tell only that he was Caucasian; she saw the man's face for the first time when she looked in her rearview mirror and saw him shooting at her car as she drove down the street. When Fouty and Emrick showed her appellant's Facebook photo, she realized that he was the man she had seen shooting at her car. On redirect examination, she reiterated that the man was only five to seven feet behind her car when he fired the shots and that neither Fouty nor Martin attempted to influence her identification of appellant as the shooter.

{¶ 30} Contrary to appellant's contention, Martin did not "recant" her testimony as to appellant's identity as the shooter. She consistently testified that she saw appellant's face in her rearview mirror as he stood in the street and shot at her car. She also consistently testified that she did not know appellant's identity at the time he knocked on her car window; she learned his identity only after being shown a Facebook photo of him. In addition, she consistently testified that neither Fouty nor Emrick influenced her identification of appellant as the shooter in any way.

{¶ 31} Moreover, even if there were inconsistencies in Martin's testimony, " 'the weight to be given to inconsistencies in any witness' testimony is a determination within the province of the trier of fact, and such inconsistencies generally do not render a conviction against the manifest weight of the evidence.' " *State v. McGowan*, 10th Dist. No. 18AP-467, 2019-Ohio-5319, ¶ 56, quoting *In re Johnson*, 10th Dist. No. 04AP-1136, 2005-Ohio-4389, ¶ 26. "It is generally 'the province of the factfinder to determine the truth from conflicting evidence, whether the conflicting evidence comes from different witnesses or is contained within the same witness's testimony.' " *Id.*, quoting *State v. Oteng*, 10th Dist. No. 14AP-466, 2015-Ohio-1231, ¶ 72. " '[T]he jury may take note of the inconsistencies and resolve them accordingly, "believ[ing] all, part, or none of the witness's testimony." ' " *State v. Rhoades*, 10th Dist. No. 19AP-93, 2020-Ohio-2688, ¶ 30, quoting *State v. Taylor*, 10th Dist. No. 17AP-103, 2017-Ohio-8327, ¶ 37, quoting *State v. Raver*, 10th Dist. No. 02AP-604, 2003-Ohio-958, ¶ 21.

{¶ 32} In addition, as we concluded with regard to the identical credibility argument advanced as to Fouty, the jury was free to accept as reasonable and credible Martin's stated justification for failing to inform the police of Emrick's presence in her car, i.e., she wanted to protect Emrick from adverse consequences that may have resulted due to her probationary status.

{¶ 33} Further, Martin identified appellant as the shooter when presented with the photo array. She explained that her reluctance to identify appellant with one hundred percent certainty was due to the fact that appellant was smiling in the Facebook photo but was not smiling in the photo array. At trial, she unequivocally identified appellant as the person who fired the shots at her car. Defense counsel conducted a thorough and extensive cross-examination of Martin, which sought to reveal inconsistences in her testimony, including those noted by appellant in the present appeal. The jury observed Martin during her testimony, including her demeanor, gestures and voice inflections, and was able to use those observations in assessing and weighing the credibility of her testimony.

{¶ 34} Finally, we note that Magaw's testimony bolstered the identification testimony provided by Fouty and Martin. Magaw described the man she saw fire 12 gunshots at cars parked along Drumlin Drive as a tall, thin Caucasian man with very short

hair. Both Fouty and Martin provided similar descriptions of the man who shot at their cars, and both identified appellant as the shooter in the photo arrays and at trial.

{¶ 35} Appellant next argues that questions posed by the jury during deliberations demonstrated jury confusion significant enough to establish that the jury lost its way and created a manifest miscarriage of justice in rendering its verdicts.

{¶ 36} During deliberations, the jury submitted the following six questions:

> [1]. Is a transcript of testimony available, specifically, Josh?
>
> [2]. Why wasn't an alibi for Darius available?
>
> [3]. Why weren't Darius' priors presented?
>
> [4]. Is an identification considered circumstantial evidence based on an inference from direct evidence, (ie, testimony), and the inference must be proven beyond a reasonable doubt?
>
> [5]. Can direct evidence during testimony be considered in determining the credibility of direct evidence in another testimony in relation to an inference?
>
> [6]. What is the legal definition of "force and weight" of the evidence?

(Tr. at 436, 460, and 469.)

{¶ 37} Following lengthy discussions with counsel, the trial court submitted the following responses to the questions:

> [1]. No, rely on your collective memory.
>
> [2]. You are to consider only the evidence presented. The burden of proof rests solely with the State. In this instance, the Defendant chose not to put on a case.
>
> [3]. You have all of the admitted evidence.
>
> [4]. The identity of the Defendant is an essential element of each count and must be proven beyond a reasonable doubt. Direct and circumstantial evidence are of equal weight. Inferences need not be proven beyond a reasonable doubt.
>
> [5]. Yes, you are not required to believe the testimony of any witness simply because he or she was under oath. You may believe or disbelieve all or any part of the testimony of any

> witness. It is your province to determine what testimony is worthy of belief and what testimony is not worthy of belief.

> [6]. It means strength of the evidence.

(Tr. at 444, 446, 452, 458-59, 468, and 472.)

{¶ 38} On appeal, appellant does not challenge the substance of the trial court's responses to the questions nor the methodology employed by the court in formulating the responses. Rather, appellant simply contends that the questions themselves demonstrate jury confusion significant enough to undermine confidence in the verdicts. Specifically, appellant contends that questions 1 and 2 demonstrate that the jury misunderstood the trial court's standard jury instructions pertaining to the presumption of innocence and the state's burden of proving guilt beyond a reasonable doubt, and that such misunderstanding resulted in the jury impermissibly shifting the burden of proof from the state to the defense. (Appellant's Brief at 8-9.) Appellant further contends that questions 3 and 4 signal that the jury was "so confused as to its role that it started asking irrelevant or nonsensical questions." (Appellant's Brief at 9.)

{¶ 39} We note initially that appellant does not provide any legal authority to support his argument that juror confusion, demonstrated solely through questions posed during deliberations, renders a conviction against the manifest weight of the evidence. Appellant's argument, in essence, challenges the jury's deliberative process, not the evidence supporting the convictions. As noted above, a challenge to the manifest weight of the evidence requires this court, sitting as a "thirteenth juror," to review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that we must reverse the conviction and order a new trial. *Wilks*, 2018-Ohio-1562 at ¶ 168, citing *Thompkins*, 78 Ohio St.3d at 387. The jury's deliberations are simply not relevant to an appellate court's manifest weight analysis.

{¶ 40} Moreover, even if appellant's juror confusion argument could be interpreted as a challenge to the manifest weight of the evidence, this court has consistently stated that it will not engage in speculation as to why the jury asked certain questions for purposes of its deliberations. *State v. Holloman*, 10th Dist. No. 06AP-01, 2007-Ohio-840, ¶ 25; *State*

*v. Ford*, 10th Dist. No. 07AP-803, 2008-Ohio-4373, ¶ 64. In addition, there is nothing in the record to indicate that the jury misunderstood or was confused by the court's responses or was otherwise unable to follow and employ them in its deliberative process. The jury verdicts were unanimous. The trial court polled the jury and it confirmed the verdicts without hesitation.

{¶ 41} Appellant's speculation about jury confusion is simply not enough to overcome the presumption that the jury followed the trial court's standard jury instructions as well as the court's responses to the jury's questions. It is well-established that " '[t]he jury is presumed to have followed the court's [jury] instructions.' " *State v. Ireland*, 155 Ohio St.3d 287, 2018-Ohio-4494, ¶ 45, quoting *State v. Jones*, 91 Ohio St.3d 335, 344 (2001). Nothing in the record supports appellant's argument that the jury's questions demonstrated confusion so egregious that the jury lost its way and created a manifest miscarriage of justice in rendering its verdicts.

{¶ 42} After reviewing the entire record, weighing the evidence and all reasonable inferences, and considering the credibility of the witnesses, we conclude that the jury did not clearly lose its way or create such a manifest miscarriage of justice that his convictions must be reversed and a new trial ordered.

{¶ 43} The first assignment of error is overruled.

{¶ 44} In his second assignment of error, appellant argues that the trial court erroneously sentenced him to a three-year prison term on the firearm specification attached to the discharge of a firearm on or near prohibited premises count. Appellant maintains that this error resulted from the trial court's failure to merge the offense of discharge of a firearm on or near prohibited premises with the offenses of felonious assault. Appellant claims that had the trial court properly merge the offenses, he would not have been sentenced on the firearm specification attached to the discharge of a firearm on or near prohibited premises count.

{¶ 45} Resolution of appellant's argument requires an initial determination as to the propriety of the trial court's failure to merge the offenses. An appellate court's review of a trial court's merger determination is de novo. *State v. Johnson*, 10th Dist. No 18AP-889, 2019-Ohio-4265, ¶ 10, citing *State v. Flood,* 10th Dist. No. 18AP-206, 2019-Ohio-2524, ¶ 25. " 'Appellate courts apply the law to the facts of individual cases to make a legal

determination as to whether R.C. 2941.25 allows multiple convictions. That facts are involved in the analysis does not make the issue a question of fact deserving of deference to a trial court.' " *Id.*, quoting *State v. S.S.*, 10th Dist. No. 13AP-1060, 2014-Ohio-5352, ¶ 28, quoting *State v. Williams*, 134 Ohio St.3d 482, 2012-Ohio-5699, ¶ 1. " 'The defendant bears the burden of establishing his entitlement to the protection, provided by R.C. 2941.25, against multiple punishments for a single criminal act.' " *State v. Washington*, 137 Ohio St.3d 427, 2013-Ohio-4982, ¶ 18, quoting *State v. Mughni*, 33 Ohio St.3d 65, 67 (1987).

{¶ 46} R.C. 2941.25 provides:

> (A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.
>
> (B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

{¶ 47} "When the defendant's conduct constitutes a single offense, the defendant may be convicted and punished only for that offense. When the conduct supports more than one offense, however, a court must conduct an analysis of allied offenses of similar import to determine whether the offenses merge or whether the defendant may be convicted of separate offenses." *State v. Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, ¶ 24. "To determine whether two offenses are allied offenses that merge into a single conviction, a court must evaluate three separate factors: the conduct, the animus, and the import." *State v. Harris*, 10th Dist. No. 15AP-683, 2016-Ohio-3424, ¶ 42, citing *Ruff* at paragraph one of the syllabus. "If any of the following is true, the offenses cannot merge and the defendant may be convicted and sentenced for multiple offenses: (1) the offenses are dissimilar in import or significance–in other words, each offense caused separate, identifiable harm, (2) the offenses were committed separately, and (3) the offenses were committed with separate animus or motivation." *Ruff* at ¶ 25. If the harm resulting from each offense is separate and identifiable, the offenses are of dissimilar import and do not merge. *Harris* at ¶ 42, citing *Ruff* at ¶ 25.

{¶ 48} In analyzing whether two offenses are allied offenses of similar import, an appellate court must look beyond the statutory elements and consider the defendant's conduct. *Johnson*, 2019-Ohio-4265, at ¶ 14. " 'A trial court and the reviewing court on appeal when considering whether there are allied offenses that merge into a single conviction under R.C. 2941.25(A) must first take into account the conduct of the defendant. In other words, how were the offenses committed?' " *Id.*, citing *Ruff* at ¶ 25.

{¶ 49} Appellant argues that the offenses of felonious assault and discharge of a firearm on or near prohibited premises arose out of the same set of circumstances, i.e., firing the gun at Martin's car. Accordingly, argues appellant, the offenses are allied and thus subject to merger, "as they are not dissimilar in import, they were not committed separately, and they were not committed with a separate animus." (Appellant's Brief at 12-13.)

{¶ 50} The undisputed facts at trial established that appellant fired his weapon 12 times while standing in the middle of Drumlin Drive, a public roadway. At least two of those gunshots struck Martin's car as she drove down the street; another struck Fouty's car, which was parked on the street. Even if appellant committed the offenses with the same conduct and the same animus, we nonetheless conclude that the trial court did not err in failing to merge them because the offenses were not of similar import or significance. Merger is not required when the offenses "are not alike in their significance and their resulting harm." *Ruff* at ¶ 21. Based on the facts presented at trial, we conclude that the harm caused by appellant's commission of the offense of felonious assault was to Martin and Fouty, while the harm caused by his commission of the offense of discharge of a firearm on or near prohibited premises was to the public.

{¶ 51} We reach this conclusion in reliance upon this court's recent decision in *Johnson.* There, Johnson fired at least 6 gunshots from his car. One of the bullets struck and killed the victim. Johnson pleaded guilty to voluntary manslaughter with a three-year firearm specification and discharge of a firearm on or near prohibited premises with a three-year firearm specification. The trial court imposed sentence on each of the offenses and ordered them to run consecutive to each other; the court merged the firearm specifications for purposes of sentencing.

{¶ 52} On appeal, Johnson argued that the trial court erred in failing to merge the offenses for purposes of sentencing. This court disagreed, concluding that each offense caused separate, identifiable harm. Specifically, this court found that the harm caused by the defendant's commission of the offense of voluntary manslaughter was to the victim; in contrast, the harm caused by the defendant's commission of the offense of discharge of a firearm on or near prohibited premises was to the public at large. In so concluding, we found persuasive the reasoning of two other Ohio appellate districts that had considered the issue of the harm caused by the offense of discharge of a firearm on or near prohibited premises. In particular, we noted that in *State v. Williams*, 2d Dist. No. 27663, 2018-Ohio-1647, the Second District Court of Appeals quoted and followed the decision of the Eighth District Court of Appeals in *State v. James,* 8th Dist. No. 102604, 2015-Ohio-4987. The *Williams* court found that the trial court did not err in failing to merge the offenses of murder and discharge of a firearm on or near prohibited premises because the offenses were not alike in their resulting harm, stating " ' "[t]he victim of the offense of discharging a firearm upon or over a public road or highway is the public. This is because it is the act itself that is prohibited. The offense can be completed with no one remotely near the location where the firearm is discharged upon or over the public road or highway. R.C. 2923.162(A)(3) is a statute intended to benefit the public good." ' " *Johnson* at ¶ 18, quoting *Williams* at ¶ 24, quoting *James* at ¶ 33.

{¶ 53} This court agreed with the Second and Eighth Districts "that the language of R.C. 2923.162(A)(3) evinces an intent by the legislature that the discharge of a firearm on or near a public roadway causes resultant harm to the public even if no person or structure is hit by the gunshots." *Johnson* at ¶ 18, citing *Williams* at ¶ 24, and *James* at ¶ 33. In further support of our conclusion, we cited additional authority from those two courts that found similarly. *Id.*, citing *In re T.P.-A.*, 2d Dist. No. 28196, 2019-Ohio-2038, ¶ 17-18; *State v. Shoecraft*, 2d Dist. No. 27860, 2018-Ohio-3920, ¶ 58; *State v. Blanton*, 8th Dist. No. 107237, 2019-Ohio-1523, ¶ 13.

{¶ 54} In accordance with the foregoing, we find that the offenses of felonious assault and discharge of a firearm on or near prohibited premises did not merge because the two offenses resulted in harm to different victims. Appellant's act of firing gunshots on a public roadway itself violated R.C. 2923.16(A)(3) and harmed the public at large. *Johnson*

at ¶ 19. Conversely, appellant's conviction for felonious assault required harm to particular victims, i.e., Martin and Fouty, and thus differed in the significance and nature of the harm it addressed. *Id.*, citing *Williams* at ¶ 24. Having concluded that the offenses of felonious assault and discharge of a firearm on or near prohibited premises are not of similar import or significance because they caused separate harm, we find that the trial court did not err in failing to merge appellant's convictions for purposes of sentencing.

{¶ 55} Our determination on the merger issue informs our analysis as to appellant's contention that the trial court erred in imposing a three-year prison term on the firearm specification attached to the discharge of a firearm on or near prohibited premises count.

{¶ 56} Pursuant to R.C. 2929.14(B)(1)(b), a trial court ordinarily is prohibited from imposing more than one prison term for firearm specifications associated with felonies "committed as part of the same act or transaction." However, R.C. 2929.14(B)(1)(g) provides an exception to this general rule, stating, as relevant here:

> If an offender is convicted of two or more felonies, if one or more of those felonies [is] * * * felonious assault * * * and if the offender is convicted of * * * a specification * * * [under R.C. 2941.145] in connection with two or more of the felonies, the sentencing court shall impose on the offender the prison term specified under [R.C. 2941.145] * * * for each of the two most serious specifications of which the offender is convicted * * * and, in its discretion, also may impose on the offender the prison term specified under [R.C. 2941.145] for any or all of the remaining specifications.

{¶ 57} Appellant was convicted of three felonies and their attendant R.C. 2941.145 firearm specifications.[1] Two of those felonies were felonious assault. Thus, R.C. 2929.14(B)(1)(g) required the trial court to impose a prison term for each of the "two most serious specifications" of which appellant was convicted. *State v. Harris*, 2016-Ohio-3424 at ¶ 49, citing *State v. Price*, 10th Dist. No. 13AP-1085, 2014-Ohio-4065, ¶ 11. By statute, the trial court was required to impose at least two three-year prison terms for the firearm specifications attendant to appellant's crimes. *Id.*, citing *Price* at ¶ 11, citing *State v. Dennison*, 10th Dist. No. 12AP-718, 2013-Ohio-5535, ¶ 88-89. In addition, R.C.

---

[1] Appellant's fourth felony conviction, for carrying a concealed weapon, did not include a firearm specification.

2929.14(B)(1)(g) conferred on the trial court the discretion to impose an additional prison term for the remaining firearm specification. *Harris* at ¶ 50.

**{¶ 58}** Appellant acknowledges that R.C. 2929.14(B)(1)(g) required the trial court to impose prison terms for each of the firearm specifications attached to the felonious assault counts. Appellant further acknowledges that if the discharge of a firearm on or near prohibited premises count did not merge with the felonious assault counts, the trial court had discretion pursuant to R.C. 2929.14(B)(1)(g) to impose a three-year prison term on the firearm specification attached to that count.

**{¶ 59}** Having determined that the offenses did not merge, the issue now resolves to whether the trial court abused its discretion in imposing a three-year prison term on the third firearm specification. Without citation to any legal authority, and without further development of his argument, appellant simply contends that "[t]he discretionary third specification was applied in error, and the court made no findings to justify its decision to do so." (Appellant's Brief at 12.) As to appellant's "discretionary" argument, the state responds that "the facts [of the case] alone prove the court did not abuse its discretion." (Appellee's Brief at 14.) Regarding appellant's "findings" argument, the state counters that the consecutive sentence findings required by R.C. 2929.14(C)(4) do not apply to sentences imposed on firearm specifications. Contrary to the state's contention, we do not read appellant's "findings" argument to assert a claim that the trial court erred in failing to make the findings required by R.C. 2929.14(C)(4) in imposing a consecutive sentence on the third firearm specification. Rather, we construe the argument as a challenge to the trial court's alleged failure to articulate its reasons for imposing sentence on the third firearm specification.

**{¶ 60}** The record establishes that the trial court seemingly believed that imposition of the three-year prison term for the firearm specification attached to the discharge of a firearm on or near prohibited premises was mandatory rather than discretionary. At the sentencing hearing, the court stated:

> On Count One [felonious assault of Amanda Martin], I will order that you serve two years in prison on the underlying felony, plus three additional mandatory years for the firearm specification for a total of five years in prison on Count One.

> The Court will order that you serve two years in prison on Count Two [felonious assault of Joshua Fouty] plus three additional mandatory years for the firearm specification, for a total of five years on Count Two.
>
> On Count Three [discharge of firearm on or near prohibited premises], I'll order that you serve one year in prison plus three additional *mandatory* years for the firearm specification for a total of four years in prison on Count Three.
>
> On Count Five [carrying a concealed weapon], I will order that you serve 12 months in prison. I will run all three firearm specifications consecutively to each other, *so it is nine years mandatory time,* and run Count Five and Count Three concurrent to the underlying sentences on Counts Two and One. * * *

(Emphasis added.) (Sept. 11, 2019 Sentencing Tr. at 32.)

{¶ 61} Following a brief discussion with counsel, the trial court reiterated that appellant's prison sentence totaled 11 years, "*[n]ine of which is going to be mandatory time.*" (Emphasis added.) *Id.* at 33.

{¶ 62} In its judgment entry, the trial court memorialized the sentence imposed at the sentencing hearing. Of particular relevance here, the trial court, consistent with its averments at the sentencing hearing, imposed a 12-month prison term on the discharge of a firearm on or near prohibited premises count plus an additional *mandatory* 3-year term on the attached firearm specification. The court ordered the sentences on the 3 firearm specifications to run consecutively to each other. The sentence imposed totaled 11 years, 9 of which resulted from the 3 three-year firearm specifications. (Sept. 11, 2019 Judgment Entry at 2.)

{¶ 63} Pursuant to R.C. 2929.14(B)(1)(g), the trial court had discretion to sentence appellant to a three-year prison term on the third firearm specification. However, the court could not have been exercising its discretion if it believed, as it articulated both at the sentencing hearing and in its judgment entry, that such sentence was "mandatory." *See State v. Bradford*, 8th Dist. No. 105217, 2017-Ohio-8481, ¶ 40 (court could not have been employing its discretion under R.C. 2929.14(B)(1)(g) in sentencing defendant if the court believed, as it stated, that it was "constrained" and "required" to impose consecutive sentences).

{¶ 64} Because the trial court concluded, contrary to R.C. 2929.14(B)(1)(g), that imposition of a three-year prison term on the third firearm specification was mandatory, the trial court erred in imposing that sentence without exercising its discretion to do so; accordingly, that portion of appellant's sentence was contrary to law.  Pursuant to our authority under R.C. 2953.08(G)(2)(b), we sustain the second assignment of error, vacate appellant's sentence, and remand the case for a resentencing hearing.

{¶ 65} For the foregoing reasons, appellant's first assignment of error is overruled, and the second assignment of error is sustained.  We affirm appellant's convictions, but reverse appellant's sentence and remand to the Franklin County Court of Common Pleas for further proceedings consistent with this decision.

*Judgment affirmed in part, reversed in part; and*
*case remanded with instructions.*

BROWN and DORRIAN, JJ., concur.

_____